

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6211-CR-HURLEY

UNITED STATES OF AMERICA,

VS.

MOHAMMED SAMHAN,

      Defendant.
_____/



### DETENTION ORDER

THIS MATTER came before the Court upon the Government's motion to detain the defendant, **Mohammed Samhan**, prior to trial and until the conclusion thereof. Having received evidence and heard argument of counsel, the Court hereby GRANTS the motion and enters its written findings of fact and statement of reasons for the detention in accordance with the provisions of 18 U.S.C. § 3142(i).

A.    INTRODUCTION

On August 3, 2000, the Court held a hearing to determine whether any condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of any person and the community. 18 U.S.C. § 3142(f). Based upon the Indictment of the Grand Jury, see United States v. Hurtado, 779 F.2d 1467, 1479

(11th Cir. 1985), the Court finds probable cause that the defendant, **Mohammed Samhan**, committed an offense for which a maximum term of imprisonment of ten (10) years or more is prescribed in the Controlled Substances Act, 21 U.S.C. § 801 et seq. This finding gives rise to a rebuttable presumption that no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e). Assuming, arguendo, that the defendant has come forward with sufficient evidence to rebut the statutory presumption, the presumption "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence." United States v. Quartermaine, 913 F.2d 910, 916 (11th Cir. 1990); United States v. King, 849 F.2d 485, 488 (11th Cir. 1988). Throughout this proceeding, the burden of persuasion is upon the Government to establish by the "preponderance of the evidence" that the defendant poses a risk of flight and/or by "clear and convincing evidence" that he poses a danger to the community. Id. at 489; 18 U.S.C. § 3142(f). In determining whether the Government has met its burden by the requisite standard of proof, this Court must take into account the factors enumerated in 18 U.S.C. § 3142(g).

B.   FINDINGS OF FACT

1.   The defendant is charged with conspiracy to possess a listed chemical (pseudoephedrine) knowing that it will be used for manufacturing a controlled substance (methamphetamine) and with possession of a listed chemical (pseudoephedrine) knowing that it will be used for manufacturing a controlled substance (methamphetamine), in violation of 21 U.S.C. §§ 841(d)(2) and 846. Therefore, the defendant is charged with

crimes involving a narcotic drug. 18 U.S.C. § 3142(g)(1).

2. The Court received credible evidence that the defendant committed the offenses with which he has been charged. In 1998, Thomas Narog became a DEA registrant, licensed to distribute drugs and medication. In September 1999, Narog began receiving extraordinarily large shipments of pseudoephedrine from drug manufacturers in New York. Narog is the sole employee of Seaside Pharmaceuticals, a newly formed company in South Florida. The company has no office and exists only in three separate storage units on Oakland Park Boulevard in Fort Lauderdale.

Pseudoephedrine is an over-the-counter cold medicine that is not illegal to possess or distribute. However, pseudoephedrine is also a precursor to methamphetamine, and it has been used to manufacture methamphetamine, often in clandestine laboratories in the western part of the United States.

Law enforcement agents in South Florida received information from their colleagues in California that pseudoephedrine with the brand name "Tru-Choice Maximum" was showing up in their arrests of individuals involved in the manufacture and distribution of methamphetamine. "Tru-Choice Maximum" is the label under which Narog received his pseudoephedrine. The Government maintains that Narog's (Seaside Pharmaceutical's) pseudoephedrine purchases from September 1999 to the present shows that he acquired quantities that far exceed what would be distributed for legitimate purposes by a pharmaceutical company of its size. The Government proffered that Narog received the following quantities of pseudoephedrine on the following dates:

| | |
|---|---|
| February 4, 2000 | 1,700 pounds (gross weight) |
| February 14, 2000 | 1,150 pounds (gross weight) |
| March 8, 2000 | 1,700 pounds (gross weight) |
| March 13, 2000 | 1,500 pounds (gross weight) |
| March 22, 2000 | 700 pounds (gross weight) |
| March 28, 2000 | 1,670 pounds (gross weight) |
| April 25, 2000 | 2,300 pounds (gross weight) |

The Government alleges that large quantities of pseudoephedrine were removed from Narog's home and warehouse during the period of the conspiracy. On February 14, 2000, Narog allegedly shipped from his Fort Lauderdale home 1,155 pounds (gross weight) of "pharmaceuticals" to a location in Heberon, West Bank, Israel.

On March 27, 2000, agents observed Narog and Ghandi Jaber load 700 pounds of pseudoephedrine into a U-Haul truck, which Jaber delivered to Tarek Abu-Lawi two blocks away. Agents then surveilled the U-Haul truck to a second warehouse unit in Delray Beach, where the pseudoephedrine was unloaded. The following day, agents observed several individuals load the pseudoephedrine from that warehouse into another rented truck. Agents followed that truck to a freight-forwarding business at the Orlando International Airport and determined that the pseudoephedrine was being shipped to an address in California. Agents alerted their California colleagues, who seized approximately 779,100 dosage units of pseudoephedrine tables, 42.5 pounds of methamphetamine, and $83,744.00 in U.S. currency and arrested eight individuals.

On April 4, 2000, Narog, Ghandi Jaber, and Motlaq Jaber loaded 1,670 pounds of

pseudoephedrine into a U-Haul truck, which Ghandi Jaber drove to a location two blocks away. There he transferred the U-Haul to an unknown individual who drove the pseudoephedrine to a Delray Beach warehouse. The following day, agents observed an individual at the Delray Beach warehouse load the pseudoephedrine into another U-Haul van and drive to a freight-forwarding company at the Orlando International Airport; the pseudoephedrine was then shipped to California. Agents notified their California colleagues, who observed several suspects take possession of the pseudoephedrine. The California agents then obtained search warrants for two storage lockers, which led to the seizure of over 2,200 pounds (gross weight) of pseudoephedrine, approximately 264 grams of extracted ephedrine, approximately 4 gallons of pseudoephedrine in solution, and a large amount of U.S. currency. In addition, seven suspects were arrested.

On April 27, 2000, Narog and Ghandi Jaber loaded approximately 950 pounds of pseudoephedrine into a rented cargo van. Jaber then transferred possession of the van to Zuhair Mahumud Rabei, who agents followed to several residences in Lakeland, Florida, as well as to a postal forwarding facility in Tampa, Florida, from which some of the pseudoephedrine was mailed to California. As a result of this surveillance, agents subsequently seized all of the pseudoephedrine, except the quantities that had been mailed from the Tampa forwarding facility. Agents notified their colleagues in California, who initiated surveillance on the pseudoephedrine as it arrived. They later seized all of the pseudoephedrine and arrested three individuals.

On June 1, 2000, agents observed Narog, Ghandi Jaber, Motlaq Jaber and Raed Nasir Aldin arrive at Seaside Pharmaceuticals. They observed the four men move boxes

of pseudoephedrine from one warehouse unit to another. Jaber then met Rabah El-Haddad and **Mohammad Samhan** at a nearby donut shop. Following this meeting, El-Haddad drove a U-Haul truck to the storage facility, and **Mohammad Samhan** followed in a Ford Explorer. According to agents, **Samhan** appeared to be looking for surveillance. El-Haddad then loaded 200 boxes of pseudoephedrine into the U-Haul truck and departed for Miami; **Samhan** followed in the Ford Explorer. The two went to a Miami packaging facility where they repackaged the pseudoephedrine into larger boxes. **Samhan** placed 15 to 20 boxes into his Ford Explorer and drove to a shopping plaza. El-Haddad took 15 boxes to a Federal Express facility and shipped them to California; he labeled the boxes as shavers and cosmetics. The following day, El-Haddad took the remaining 22 boxes from the packaging facility and shipped them also to California. A few days later, El-Haddad travelled to California to facilitate the transfer of the pseudoephedrine. There he met with a confidential informant ("CI"). El-Haddad told the CI that he was looking for the "rat" in the organization, a reference to the earlier pseudoephedrine seizures by law enforcement.

On June 1, 2000, agents observed Matlaq Jaber and Raed Nasir Aldin unload several hundred boxes of pseudoephedrine at a Boynton Beach townhouse. Agents executed a search warrant at the townhouse and observed that the entire residence had been converted into a location for repackaging pseudoephedrine pills. Agents seized 118 boxes of pseudoephedrine and 31 boxes of loose pseudoephedrine pills (3,352,320 dosage units), which had been removed from their bottles and placed in gallon sized ziplock baggies. Agents also located at the residence thousands of empty

pseudoephedrine bottles.

On June 15, 2000, El-Haddad and **Mohammed Samhan** obtained a load of pseudoephedrine from Narog's warehouse. El-Haddad and **Samhan** delivered the pseudoephedrine to a packaging store in Miami where they repackaged it into 27 large cardboard boxes, loaded it onto a truck, and delivered it to Miami International Airport for shipment to Salem, Oregon. El-Haddad had labeled the pseudoephedrine as "shoes." A few days later, El-Haddad travelled to Oregon. Agents in Oregon seized the 27 boxes of pseudoephedrine.

On July 21, 2000, additional quantities of pseudoephedrine were transferred from Narog's storage facility to a packaging facility in Miami. There El-Haddad had **Samhan** repackaged the pseudoephedrine into larger boxes and placed them into **Samhan**'s Ford Explorer and into a van owned by El-Haddad's wife. As reported by the agents, **Samhan** and El-Haddad then conducted counter-surveillance. By way of example, they would drive around a block three or four times to ensure that they were not being followed. A few days later, a portion of that pseudoephedrine was shipped to California. El-Haddad then travelled to California, where he was arrested. Agents seized 220 pounds of loose pseudoephedrine pills.

**Samhan** was arrested in Miami and consented to a search of his residence. Agents discovered at his residence 144 pounds of loose pseudoephedrine pills that had been removed from the manufacturer's bottles. **Samhan** told agents that he had never been at the Miami packaging facility or at Narog's storage facility. Agents, however, claim to have seen him at those locations on several occasions. 18 U.S.C. § 3142(g)(2).