UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6211-CR-HURLEY/VITUNAC

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

MOHAMMED SAMHAN,

      Defendant.

_____/



## MOTION FOR *DE NOVO* REVIEW OF ORDER SETTING DETENTION PENDING TRIAL [18 USA 3145 (B)]; DE NOVO HEARING; MEMORANDUM OF LAW; 88.9 CERTIFICATE

The Defendant, MOHAMMED SAMHAN, respectfully moves this Honorable Court for a *de novo* detention hearing pursuant to 18 U.S.C. 3142 (a) (2) and for an order granting a reasonable bond for the following reasons:

### GROUNDS

1.    Prior to the detention hearing, former counsel for the Defendant was reasonably led to believe that the Defendant would be granted bond.

2.    In reliance on that reasonable belief, counsel did not present evidence Defendant's substantial ties to the community, the lack of Defendant's legal ability to visit his country of origin and his lack of dangerousness.

3.    The Defendant has no history of violence and substantial contacts in the community. There is no evidence that he has any assets or contacts in any other country which could be of assistance if Defendant were to flee.

## BRIEF STATEMENT OF THE CASE

On July 31, 2000 the Defendant appeared for his initial hearing represented by the office of Jose Puig. Assistant United States Attorney Larry Bardfeld requested a detention hearing but later indicated to defense counsel that he would likely not be asking for detention.

The pre-trial services officer similarly was of the opinion that bond was appropriate and in fact made that recommendation to the Court. Relying on the Government's original indication, attorney Jose Puig did not fully investigate the available evidence supporting lack of flight, contacts in the community and lack of dangerousness. He also refrained from cross-examining the Government's case agent.

On August 3, 2000, the pre-trial detention hearing was conducted. Because of the aforementioned lack of preparation, counsel for the Defendant was unprepared for an adversarial hearing. (R.T. 8-3-2000, pp. 15-16, 20-22). The Defendant was detained based on the statutory presumptions of dangerousness and risk of flight. (R.T. 8/3/2000, p. 22).

Since the detention hearing, the Defendant has retained new counsel who has obtained sixteen (16) signed letters (Exhibits 1-16) stating that the Defendant's life is and has been in the Southern District of Florida. Eight (8) of these persons are so sure Defendant is not a flight risk of flight that they will pledge their assets to collateralize his bond. In addition, the Defendant anticipates producing over fifty (50) persons at the hearing to verify his character and community ties.

Motion for Review of Order Setting Conditions of Detention...
Case No.: 00-6211-Hurley/Vitunac
Page 3

The Defendant, a legal resident with a pending application for citizenship, obtained his residency through a political asylum claim. He now has no passport or documents that would allow him to enter another country.

At the detention hearing, there was little evidence of risk of flight. (R.R. 8/3/2000, p. 14) and no evidence that Defendant was a danger to the community. Instead the Government focused on the evidence against the Defendant. The evidence showed that Mohammed Samhan is a peaceful man with the lowest level of relative culpability in this offense.

## THE DEFENDANT IS NOT A FLIGHT RISK

1.    **IMMIGRATION STATUS:**    Mohammed Samhan is a lawful United States resident who has a pending application to become a United States citizen. Mr. Samhan has made Miami, Florida his home since 1986.

2.    **TRAVEL:**    Mohammed Samhan has traveled to Jordan for his brother's wedding and mother's illness. Both his mother and that brother are now in Miami, Florida. Defendant has a surviving mother and six (6) brothers and sisters. All but one are presently in the United States.

3.    **FAMILY AND COMMUNITY TIES**:    Mohammed    Samhan's immediate family lives in Miami, Florida.   This includes his two minor daughters, ages 2 and 4, both of whom are solely United States Citizens. Numerous members of his extended family reside in South Florida.

Defendant and his wife own the family home, the family business and one  additional piece of real property.

4. **STEADY EMPLOYMENT**:    Mohammed Samhan has had steady employment as a proprietor of many small businesses.  He has owned and operated "Food Plus" Grocery market located at 12882 S.W. 87th Avenue, Miami, Florida for the past six (6) years.

5. **COMMUNITY SERVICE:**    Mohammed Samhan is a proud sponsor of the "Save the Children" program since 1992.  He is also a yearly donor to a local police department in support of disadvantaged children. He is continuously helping members of the community that have family and business problems.

6. **ALLEGATIONS OF FLIGHT RISK:**    Mohammed    Samhan has an expired  Jordanian passport. He cannot readily return to Jordan or Palestine.

## LACK OF DANGER TO THE COMMUNITY

1. **PRIOR ARREST:**    Mohammed  Samhan has no prior felony arrests.  His one misdemeanor was a state food stamp violation. He appeared at all hearings and successfully completed the terms of his probation.

2. **LACK OF VIOLENCE**:  Mohammed  Samhan  has  never  been charged with nor involved in an act of violence, nor has he threatened anyone. When arrested he was non-violent and cooperative.  He has had no knowledge or contact with informants and is well aware of his obligations in this regard.

## MEMORANDUM OF LAW

### REOPENING THE HEARING

18 U.S.C. 3142 (f) provides "the hearing may be reopened before or after a determination by the judicial officer, at any time before the trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing that has material bearing on the issue...(of flight and safety). See United States v. Peralta, 849 F. 2d 625, 626-627 (D.C. Cir. 1988).

Changed circumstances such as a lengthier period of detention and additional collateral may justify reopening a Detention hearing and subsequent release. United States v. Chen, 820 F. Supp. 1205, 1201, 1211 (N.D Cal. 1992). It is likely that Defendant will not go to trial  in this caseuntil late Spring 2001, well beyond the Speedy Trial period.

Detention hearings can be re-opened based on newly discovered evidence.  United States v. Alonso, 832 F. Supp. 503 (D. Puerto Rico 1993).

### THE REBUTTABLE PRESUMPTIONS ARE INSUFFICIENT

### TO JUSTIFY DETAINING THIS DEFENDANT

Once the statutory presumptions are raised a Defendant carries the burden of production to come forward with evidence to rebut the presumptions.  This obligation to come forward with evidence does not relieve the Government of its burden of persuasion, see United States v. King, 849 Fed. 2d 485 (11th Circuit 1988), United States v. Quartermain, 953 F. 2d 910 (11th Circuit 1990).  Once the Defendant comes forward with such evidence

the presumption are reduced to evidentiary findings which are to be weighed with other evidence relating to the factors listed in §3142(g) of the Statute.

In <u>United States v, Gerbo</u>, 948 F. 2d 1118 (9th Cir. 1991), the Court mandated that it would be a rare circumstance where detention was appropriate. In a close case the defendant must be released.

<u>U.S. v. Orta,</u> 760 F. 2d 887 (8th Cir. 1985) favors release based on a combination of conditions. In <u>U.S. v. Fortuna</u>, 769 F. 2d 243 (5th Cir. 1985) It was noted that it is not what the accused might do, but whether a combination of conditions can overcome the presumption. <u>U.S. v. Cardenas</u>, 784 F. 2d 937 (9th Cir. 1986), states that the weight of the evidence is the least important factor. No pre-trial detention should be based solely on the weight of the evidence.

Here the Government spent a substantial portion of its presentation on the evidence, much of which related to others. Co-defendant Rabbah El Haddad, who is clearly much more culpable than Defendant Samhan and who supervised him, was granted a $100,000.00 corporate surety bond based on the same presentation.

Once the presumption is overcome, the Government must establish that the Defendant is a danger to the community by clear and convincing evidence. <u>United States v. Miller</u>, 625 F. Supp. 513 (D. Kan. 1985) "the Defendant must be one of those rare cases warranting pre-trial detention". Only objectively reasonable assurances of safety are required, not a guarantee. <u>United States v.</u>

Gray, 651 F. Supp. 432, 855 F. 2d 858; Cert. Den. 488 U.S. 866, 109 S. Ct. 171, 102 L. Ed. 2d. 141 (1987).

The "Government may not rest solely on the rebuttable presumption to support its motion to detain a Defendant pending trial. Evidence that a defendant committed the narcotics offense with which he is charged, even if compelling, cannot by itself satisfy the requirement of 3142(f)." United States v. Moore, 607 F. Supp. 489, 498 (D.C. Cal. 1985)

The risk of flight can similarly be rebutted by the presentation of sufficient evidence of the factors set forth in the statute. For example, in United States v. Townsend, 897 F.2d 989(9th Circuit 1990) the Court determined that an alien defendant's ties to the United States should be assessed in light of the length of time that the defendant resided in the Country, whether the defendant has been employed, whether he owns any property and whether defendant has any relatives who are United States citizens or residents.

As set forth herein this Defendant has extensive ties to this community. He is married and has two children who are citizens. He is a resident of over 15 years with a pending citizenship application. He has numerous family members who are citizens and residents. He owns substantial properties in this district. Evidence of a Defendant's marital, family and employment status, ties to the community and a clean criminal record may rebut one or both of the statutory presumptions, Dominguez, Supra.

Case No.: 00-6211-Hurley/Vitunac
Page 8

Even the wearing of an electronic monitoring bracelet can, when considered with other factors, be sufficient to overcome the presumption that a narcotics Defendant poses a serious risk of flight, United States v. O'Brien, 895 F.2d 810(1st Circuit 1990). The undersigned has confirmed with Pre-Trial Services in this district that such electronic monitoring bracelets are available for consideration by the Court as a condition of release.

Additionally the instant charges arise from a conspiracy dealing with the purchase and shipment of pseudoephedrine in large quantities to the West Coast where it presumably was combined with other chemicals to make methamphetamine. As the Government noted (R.T.8-3-2000 p 4,)

"Mr. Narog is the only the person involved in this indictment who can obtain the pseudoephedrine from manufacturers because he is the only DEA registrant among the Defendants."

Defendant Narog, the lead defendant, is detained. In United States v. Beesley, 601 F. Supp. 82 (11th Circuit 1984) the Court granted that defendant a bond, in part because her partner (husband) in the alleged crimes was detained and therefore unavailable to assist that defendant in attempting to flee.

The detention of Do-defendant Narog alone rebuts the presumption of dangeressness arising from the charges as to Defendant.

## FLIGHT

Although Courts can always suggest facts that indicate the accused might have an opportunity to flee, the mere opportunity to flee is insufficient to order detention. United States v. Chen, 820 F. Supp. 1205 (N.D. Cal 1992).

**Motion for Review of Order Setting Conditions of Detention...**
**Case No.: 00-6211-Hurley/Vitunac**
**Page 9**

Chen, supra, also states that the Government's burden is not trivial and that preponderance means more than just the civil standard. All doubts should be resolved in favor of the Defendant.

Substantial family ties decrease the risk of flight. United States v. Garcia, 801 F. Supp 258 (S.D.Iowa 1992). Substantial family, friends and long standing employment are also factors that overcome the presumption and negate a risk of flight. United States v. Carbone, 793 F. 2d 559 (3rd Cir. 1986).

Considering the continued lack of evidence of foreign assets and unexplained wealth, the newly presented evidence of contacts in the community, lack of arrests, steady employment and the bond plan suggested below, there is no reliable evidence that Mohammed Samhan is a flight risk. All doubts should be resolved in his favor. Chen, Supra.

## DANGEROUSNESS

The Government must prove the facts supporting its contention that the Defendant is a danger to the community by clear and convincing evidence, 18 U.S.C.§3142 (f)(2)(B). The risk of flight need only be proved by a preponderance of the evidence, King, Supra and Quartermain, Supra .

A defendant may rebut the presumption of dangerousness by evidence of economic and social stability coupled with the absence of any relevant criminal record; see United States v. Simmons, 643 F. Supp. 290 (S.D.Fla. 1986); and United States v. Dominguez, 783 F. 2d 702 (7th Circuit 1986) where the Defendants were Cuban immigrants who were lawfully in the Country for about five years. Neither had any criminal records. One was employed as a body

Case 0:00-cr-06211-DTKH   Document 138   Entered on FLSD Docket 09/28/2000   Page 10 of 60
Motion for Review of Order Setting Conditions of Detention...
Case No.: 00-6211-Hurley/Vitunac
Page 10

shop mechanic. The other was married with family in Florida and Nevada, employed as a welder and owned a welding business in Florida. The Court found that that evidence, coupled with the absence of any relevant criminal record, was sufficient to rebut the presumption of dangerousness raised by the Statute.

Congress intended Pre-Trial Detention for risk of dangerousness only for those individuals who were part of a:

> "Small but identifiable group of particularly dangerous Defendants as to whom either the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons."

[(United States v. Accetturo, 783 F. 2d 382(3rd Circuit 1986).] The instant Defendant is clearly not a member of such a group.

Perhaps the best analysis of the legislative intent of the Act can be found in 35 Arizona Law Review 1091 (1993). The article quotes the Senate report as stating that there must be a strong logical inference of future dangerousness such as offender characteristics (prior arrests, convictions, drug addiction) and offense characteristics. This logical inference is not present herein.

In the instant case, there is no evidence, such as informant testimony or tapes, that Defendant will traffic in narcotics if released, United States v. Trammel, 922 F.Supp. 257 (N.D. Okla. 1995); or that he is a member of an ongoing drug or criminal organization, U.S. v. Shea, 749 F. Supp. 1162 (D. Mass. 1990). There is no evidence that his group is continuing to traffic in narcotics or would continue knowing an investigation was in progress. The

only Co-Defendant with the requisite DEA license to obtain pseudoephedrine is detained.

Furthermore, there is not the slightest hint that the Defendant would be a threat to any witnesses, U.S. v. Gatto, 787 F. Supp. 903 (D.N.J. 1989).

There are no guns involved in the offense and certainly none linked to this Defendant. U.S. v. Idinger, 623 F. Supp. 1386 (N.D.Mo. 1985); U.S. v. Lepene, 599 F. Supp. 1322, amended 603 F. Supp. 375 (D. C. Mass. 1984) (loaded guns plus continuing criminal enterprise to import narcotics insufficient standing alone for detention).

Mohammed Samhan's community ties, longstanding employment and outstanding past record easily overcome the presumption of dangerousness, Dominguez, supra .

A charge of trafficking in drugs is insufficient in and of itself to support a finding of dangerousness, Dominguez, supra . Additionally, the burden to rebut the statutory presumption of dangerousness is not a heavy one and can be rebutted, as stated above by a lack of criminal record and economic and social stability.

## FACTORS IN THE ACT FAVOR RELEASE

Furthermore, the statutory factors to be considered to determine if there are conditions of release that would reasonably assure appearance and a lack of danger favor Mohammed Samhan's release . They are:

1.   **Character:** His character is exemplary.  He has suffered only a misdemeanor.

Motion for Review of Order Setting Conditions of Detention...
Case No.: 00-6211-Hurley/Vitunac
Page 12

2.    **Physical Condition**:    He is having a difficult time in custody due to some minor ailments.

3.    **Mental Condition:** Excellent.

4.    **Family Ties :** solid support in Florida.

5.    **Employment:**    Steady and continuous.

6.    **Community Ties**: longstanding ties to this community, church and school.

7.    **Past Conduct**:    No violence or past felony arrests.

8.    **No drug or alcohol abuse**.

9.    **Missed court appearance** - None.

10.    **Not on probation.**

11.    **Not on parole**.

12.    **Weight of the evidence**:    Although this is the least important factor at a detention hearing, the weight of the evidence is not strong. There are no informants. The Defendant was not arrested with any illegal substances nor while performing any clandestine activities. There are no tape recordings implicating the Defendant. The Defendant did not confess. There is no past crime evidence. The Defendant did not travel to the jurisdiction where the alleged precursor chemicals were sent. There are no telephone logs connecting Defendant to any persons who received the alleged precursor chemicals. There is no financial evidence linking the Defendant to the conspiracy.

## LEVELING THE PLAYING FIELD

The Arizona Law Review, Supra, article also quotes statistical studies and the reasons why the chances of an acquittal are drastically reduced when one is detained.  The lack of access to counsel and the Defendant's inability to assist counsel with the investigation are clear in the instant case.

## SUGGESTED BOND PLAN

If this Court is not satisfied with only a corporate surety bond, electronic monitoring , curfew or house arrest are available.  U.S. v. Traitz, 807 F. 2d 322 (3rd Cir. 1986) is a well-reasoned case that prefers house arrest to detention. This Honorable Court can fashion relief where Mohammed Samhan has substantial restrictions that reasonably assure his appearance and the safety of the community.

In addition, the family and friends  of Mohammed Samhan will pledge their real estate holdings to secure his appearance. Only the two lead defendants in this case have been detained There have been at least five bonds set in this matter. A Corporate bond of $100,000.00  with conditions is the highest bond set thus far, and was sufficient for the more culpable Haddad.

A reasonable corporate surety bond, a personal surety bond of $500,000.00 co-signed by Defendant's family members and additional conditions, such as   surrendering the passports of Defendant and his family(even though his passport is expired), house arrest, electronic monitoring and reporting to pre-trial services by telephone and in person as directed can

Motion for Review of Order Setting Conditions of Detention...
Case No.: 00-6211-Hurley/Vitunac
Page 14

further reasonably assure this Court that Mohammed Samhan will not be a flight risk, nor a danger to the community.

## CONCLUSION

The first detention hearing was not fair. Counsel, relying on the Government, did not present significant evidence.

The presumption is not sufficient for a finding of dangerousness in and of itself. Mohammed Samhan's abundant family ties and economic stability are sufficient to overcome the presumption of flight. When the burden shifts to the Government to establish detention by clear and convincing evidence, the bond plan must prevail. The Defendant is not a flight risk in light of the collateral that will be used to secure his appearance, and the additional suggestions herein.

The abundant community service by Mr. Samhan should also be strongly considered to rebut dangerousness to the community.

The Defendant respectfully requests that a *de novo* detention hearing be conducted with the Magistrate Judge.

Dated this _____ day of September, 2000.

WE HEREBY CERTIFY that copies hereof were furnished by U.S. mail to all counsel on the attached service list.

LEONARD P. FENN, ESQ.
Counsel for Defendant Samhan
2121 Ponce de Leon Blvd., S-430
Coral Gables, Florida 33134
(305) 448-7200/Fax: 444-0913
Florida Bar No.: 237337

RICHARD A. HAMAR, ESQ.
Counsel for Defendant Samhan
2437 Briarcrest Road
Beverly Hills, CA 90210
(310)550-0460/Fax: (310)550-0461
Florida Bar No.: 152751

**Motion for Review of Order Setting Conditions of Detention...**
**Case No.: 00-6211-Hurley/Vitunac**
**Page 15**

## LOCAL RULE 88.9 CERTIFICATE

Counsel Leonard P. Fenn spoke with Assistant United States Attorney Larry Bardfeld, on September 22, 2000. Mr. Bardfeld indicated that prior defense counsel was under the reasonable misapprehension that bond would be granted.

Mr. Bardfeld stated that the government has no position on Defendant's request to re-open his bond hearing but the government is opposed to the granting of a bond for Defendant.

LEONARD P, FENN, ESQUIRE

**SERVICE LIST**
*United States v. Mohammed Samhan*
*Case No.: 00-6211-HURLEY/VITUNAC*

**AUSA Larry Bardfeld**
500 East Broward Blvd., 7th Floor
Fort Lauderdale, Florida 33394-3092

**Fred Haddad, Esquire**
Attorney for Defendant NAROG
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394

**Glenn Seiden, Esquire**
Attorney for Defendant JABER
33 North Dearborn Street, Suite 1015
Chicago, IL 60602-3105

**Mark E. NeJame, Esquire**
Attorney for Defendant ALMASRi
1 South Orange Avenue, Suite 304
Orlando, FL 32801

**Theodore W. Weeks, Esquire**
Attorney for Defendant ABDELMUTI
1 Lake Morton Drive
P.O. Box 3
Lakeland, FL 33802-003

**Timothy Basiello, Esq.**
Attorney for Defendant FNEICHE
33 North Dearborn Street
Chicago, IL 60602

**Bruce A. Goodman, Esquire**
Attorney for Defendant AQUIL
2900 East Oakland Park Blvd.,
3rd Floor
Ft. Lauderdale, FL 3306

Honorable Daniel T. Hurley
Honorable Magistrate Judge Barry S. Seltser
U.S. District Court
Southern District of Florida


Dear Honorable Judges:

My name is William F. Hampton. I reside at 14400 SW 95 Ave. Miami, Fl. 33176. I have lived in this area for 33 years. I am a cheif deputy  administrator of the circuit court.

Mohamed has been my friend for 5 years. He is a good, honest, well respected business man.

I am sure Mohamed will respect the conditions of a bond. I am willing to post my home as collateral for the bond. My home has a market value of  $175,000. and equity in the amount of 175,000.

Thank you for your kind concideration and feel free to contact me at 305-233-0694 or 305-349-5533.



Sincerely,

William F. Hampton

Honorable Daniel T. Hurley District Judge
Honorable Magistrate Judge Barry S. Seltzer
Southern District of Florida

Dear Honorable Judges:

My name is Khamis Samhan I reside at 9531 Fontainblea
BLVD. B10 Apt. 541 Miami Florida 33172 and I live in this
For 6 months and I live in the United States for ninteen
years. I'm a manager of Z and H market 1700 N.W 2ct
Miami, Florida. I have known Mohammed Samhan for 35
years. Mohammed Samhan he is brother and I known is a
very good person and a family man. He been here for in the
United States for fourteen years. All of his time he a hard
working man and honest and respected member of the
community. A honest business man with a reputation. He
have a large family including two minor children to whom
he devotes himself and loves dearly. I have been advised
that he his been arrested for possessing an illegal drug.
This is surprising to me because he is a good person, has a
good reputation in the community and does not have a
reputation of being involved in drugs. I am sure he would
respect his conditions of bond. I am willing to sign any type of
papers for the bond. I am sure he will come to court and
I am sure that he will respect any postive adjustments.
Thank you for your kind consideration and feel free to
contact me at: 305-576-8874 work phone or at 305
554-9688 home.

Sincerely,
Khamis Samhan

9-18-2000

Honorable Daniel J Hurley
Honorable Magistrate Judge Barry S. Selter
U. S District Court
Southern District of Florida

Dear Honorable Judges:

My name is Nasser Soufia, I reside at 1133 NW 135th Court, Miami, and I have lived in this area for the past four years. I am a Store owner in Miami Beach, Florida.

Mohmad Samhan is a friend of mine, and he has been a very good friend of mine for the last four years. Mar Samoan is a very respected member of the community, and he is known to be a honest, and a great family man. He has two minor children whom he love, and adore too much.

I have been advised he has been arrested for possessing of illegal drugs. This was shocking news to me, because he has a good reputation in the community, and never known to deal with drugs before.

I am sure he would respect his condition in bond, and I am willing to post my home as collateral for the bond. My house has a market value of $170,000.00 and an equity of $35000.00.

Thank you for your kind consideration, and feel free to contact me at 305-554-5255.

Sincerely

Nasser Soufia

Honorable Daniel J Hurley
Honorable Magiatrate Judge Barry S. Selter
U. S District Court
Southern District of Florida

9 - 16 - 2000

Dear Honorable Judges:

My name is Maurice Barakat, I reside at 12455 SW 22 Ter, Miami, and I have lived in this area for the past twenty four years. I am a Real Estate Investor in Miami, Florida.

Mohmad Samhan is a friend of mine, and he has been a very good friend of mine for the last eight years. Mohmad Samhan is a very respected member of the community, and he is known to be an honest, and a great family man. He has two minor children whom he love, and adore too much.

I have been advised he has been arrested for possessing of illegal drugs. This was surpresing news to me, because he has a good reputation in the community, and never known to involved with drugs before.

I am sure he would respect his condition in bond, and I am willing to post my home as collateral for the bond.

Thank you for your kind consideration, and feel free to contact me at 305-552-5896.

Sincerely

Maurice Barakat

9 - 16 - 2000

September-18-20-

Honorable Daniel T. Hurley U.S. DISTRICT Court Judge
Honorable Magistrate Judge Barry S. Seltzer
U.S. District Court
Southern District of Florida

Dear Honorable Judges:

My name is WAEL ASAD I reside at 8134 S.W 163rd Ave
Miami, FL 33193 And I have lived in this area For 3 years. I am
manager at Quick STOP located At 3970 S.W 67th Ave Miami.

I have known Mohammed Samhan For 10 years. In the USA
And I have known my Uncle Mr. Mohammed Samhan Since I born.
Because He is one of my family

Mr. Samhan is respected member of the community. He is an
honest business man with a good reputation.

He has a large family, including two minor (Dana & Ruba)
To whom he devotes himself and loves dearly.

I have been advised that he has been arrested For possessing an
Illegal drug. This is surprising to me because He is a good person.
Has a good reputation in the community and does not have a reputation of being
Involved in drugs.

I am sure he would respect his conditions of bond. I am
willing to post my home as collateral For the bond. My home has
A market value of $150.00.00 and equity in the amount of $30.00.00
To determine equity, take the market value of the House and subtract
The mortgage or loans on the house.

Thank you For kind consideration and Feel Free to contact
Me at (305) 498-2484.

Sincerely,
~~Wael~~
WAEL ASAD

Honerable Daniel T. Hurley
Honerable Magistrate Judge Barry S. Seltser
U.S District Court
Southern District of Florida

Dear Honorable Judges:

My name is Khamis Samhan. I reside at 9531 Fontaine Bleau Blvd. Miami, Fl. 33172 Apt. B-10 #501. I am a permanent resident with a pending citizen application. I have resided in this country for 19 years. I have 4 children who are US citizens. I am the manager of Z & H market located at 1700 NW 2 CT.

Mohamed Samhan is my brother. He is a hard working, respected member of the community.

I have been advised that Mohamed has been arrested for possessing an illegal drug. I know my brother does not deal with any kind of drugs.

I am sure that Mohamed will respect the conditions of a bond and I am willing to sign any type of document to ensure that Mohamed will respect the conditions. Feel free to contact me at 305-554-9688 or 305-576-8874.

Sincerely,

Khamis Samhan

September 20, 2000

DEAR HONERABLE JUDGES

My name is Mahmoud Hamadeh; I live at 4601 N.W. 13 Ave. pompano beach FL. 33064. I have lived in this area for fifteen years (15), I am the owner of Snackmaster inc. for more then 7 year at 1717 SW 1st way, Deerfield beach fl. 33441.

I have known Mohamad Samhan for 12 years.

We lived together for more then 3 years he is more then brother to me and to every body in the community.

Mr. Samhan is a respected member of the community; he is an honest business man and with a good reputation, and every body likes him

He has a large family, including two minor children to whom he devotes himself and loves dearly.

I have been advised that he has been arrested for possessing an illegal drug. This is surprising to me because he is a good person with a good reputation in the community, and does not have a reputation of being involved in drugs.

I am sure he would respect his conditions of bond. I am willing to put my house as collateral for bond; my home has a market value of one hundred and thirty thousand US dollars ($130,000), and equity in the amount of fifty thousand US dollars, ($50,000).

Thank you for your kind consideration and feel free to contact me at (954,418 8510).

Sincerely,

Mahmoud Hamadeh

September 20, 2000

My name is Audrae Kores. I live at 9402 SW 77 Ave. Miami, Fl 33156. I am originally from Connecticut. I am a real estate agent working for Prudential Florida Realty.

I have known Mohamed Samhan for approximately 5 1/2 years. He has been my best friend. He is the most honest, kind, gentle man I have ever met. I have watched him help many of his friends when in time of need. He has never turned down a friend. He is the best, the most faithful friend one could ever have.

I have learned that Mohamed has been arrested for possessing an illegal drug. I don't believe for one minute that Mohamed would involve himself knowingly in such a thing. I know for a fact that he is one of the few convenience store owners who did not involve himself in illegal activity. He just simply is not that kind of man. The only thing Mohamed could possibly be guilty of- is trusting everybody. Because he is so good at heart, he believes that everybody else is also good. Mohamed is truly a good, honest, decent, respectable man. He would never intentionally jeopardize his family or the respect of his friends.

I am sure Mohamed will respect the conditions of a bond. I am willing to put my condominium as collateral. My condo has a market value of $65,000.00, and equity in the amount of $15,000.00.

If I could be of any assistance, please contact me at 305-598-9170 or 305-606-4453.

I thank you deeply for your time.

Respectfully,

Audrae D. Kores

**ADAM'S BAIL BONDS**
2200 N.W. 11th Street
Miami FL 33125
Tel: 305 - 631- 9888
Fax: 305 - 631- 8883

# TO WHOM IT MAY CONCERN

I, Ahmad Asad, the President of ADAM'S BAIL BONDS have been in business for almost five years. I run an outstanding Bail Bond agency that has a good record and outstanding history with the District, Circuit and County Courts of the State of Florida.

I am willing to use my Agency that worths 450,000.00 USD that is paid in full and free as well as clear of any links or pending lawsuits to use it as a collateral to the Court on behalf of the defendant MOHAMMED SAMHAN and I am willing to take as a bondsman with liability up to 5 million dollars in a limit of corporate surety bond that's secured by an Insurance Company and also willing to put up my private property that worths 210,000.00 USD also for collateral to the Court on behalf of the defendant if needed for this particular matter.

If you have any questions, please, do not hesitate to contact my office at the above detailed address and phone number.

ADAM'S BAIL BONDS
2200 N.W. 11th Street
Miami  FL 33125

Ahmad Asad
President

Maher Al-Jamal
8515 SW 129 th Terr
Miami, Fl 33156

September 19, 2000

To Whom It May Concern:

Re: Mohammed Samhan


Dear Sir or Madam:

I **Maher Al-Jamal,** hereby swear that I know Mohammed Samhan.

He is a very good business acquaintance of mine and we have worked together on a number of occasions.

He has helped us a lot doing a lot of volunteer work for the community. He is a very honest and humble man.

Please let me know should you require any further assistance towards this matter.

Respectfully yours,



Maher Al-Jamal

*Omar Al-Mwala*
*Miami, Fl 33156*

*September 19, 2000*

*To Whom It May Concern:*

*Re: Mohammed Samhan*

*Dear Sir or Madam:*

*I **Omar Al-Mwala,** hereby state that I know Mohammed Samhan.*

*He is a very good man and has helped us a lot towards the entire religious community.*

*He is an honest, reliable man and very hardworking. I have known him for a number of years and he still remains my one friend.*

*Should he need any help towards this situation I would be glad to assist.*

*Respectfully yours,*



*Omar Al-Mwala*

Ehsan Hashemi
Miami, Fl 33156

September 19, 2000

<u>To Whom It May Concern:</u>

Re: Mohammed Samahan

Dear Sir or Madam:

I **Ehsan Hashemi,** hereby swear that I know Mohammed Samhan.

He is a very good friend of mine and I have known him for many years. He is an honest man and very dedicated to his family and friends.

Should you require any further information about him please do not hesitate to contact me and I will be glad to be of help.

Respectfully yours,

Ehsan Hashemi

Mohammed Al-Jamal
Miami, Fl 33156

September 19, 2000

**To Whom It May Concern:**

Re: Mohammed Samahan

Dear Sir or Madam:

I **Mohammed Al-Jamal**, hereby state that I know the said above by the name of Mohammed Samhan.

He is a very good and honest person in our community and has served us well. He is a hard worker and very dedicated to his work. We have done a lot of business together and I do speak highly of him.

Should you require any further information about him please do not hesitate to contact me and I will be glad to be of help.

Respectfully yours,

Mohammed Al-Jamal

Sept 18, 2000

Honorable DANIEL T. Hurley, United State Distric Court Judg
Honorable MAGISTRATE Judge Barry S. Seltzer
US Distric court
Southern Distric of Flonida.

Dear Honorable Judges:

MY NAME is Ahmed M. Chehab I live + Reside
in DADE count for over 30 years I own
CHEHAB RESTAURENT EQUIPMENT., + CURRENTLY HAVE
Been FARMING BAMBOO PLANTS.
MR SAMHAN is a long time friend and Business
AQUAINTANCE for over 10 years

MR SAMHAN is a Respected member of the comunity
He is the father of Two lovely children,
He Devote the Bulk of his Time To His FAMILY.

Thank you for your consideration and feeh free
to contact me at my Home or Business, at the
Following No. home: 305 256 1945   Bus. 305 258 48

Sinserly your's
Ahmed M. Chehab.

Honorable Daniel T. Hurley District Judge
Honorable Magistrate Judge Barry S. Seltzer
Southern District of Florida

Dear Honorable Judges:

My name is Aref Samhan I reside
at 2258 N.E. 173st North Miami Beach
FL. 33160 Apt #2 and I live in this
place for 2 years and I lived in
the United States for 15 years
and I have family and children
in America. I am an owner
of a whole sale company
"Convenience plus whole sale
grocery, 3161 s.w 25st pembroke park
FL. 33009. I have known Mohammed
Samhan for 35 years because
he is a brother and I knew
he is a very good person and
a good family man. He has
been in America for 14 years,
All 14 years he has been a hard
working man, honest and a
respected member of the commun
He is an honest business man
with a Reputation and he has
a large family including 2
minor children to whom he
devotes himself and loves dear

Thank you for your kind consideratio
and feel free to contact me
at (305) 992-4234 or at work (954)985-74

BRET Sanhan

HONORABLE Daniel T. HURLEY DISTRICT Judge.
Honorable Magistrate Judge BARRY S. SELTZER
Southern District OF FLORIDA

Dear Honorable Judge:

My name is Fatima Shatat. I Reside
at 20507 NE 9th PL. Miami, FL. 33179. I lived
here FOR 2 years and I have lived in the
United STATES FOR 15 years. I have known MR.
Mohammed Samhan FOR 10 years, he is a very
good person, a Family man, Respectable, honest
business man. He is a Father OF 2 minor
children. To whom he devotes himself and loves dearly.
Thank you FOR your kind consideration. FEEL
Free to contact me at (305) 772. 5570.



Fatima Shatat

September 20, 2000


My name is Avner Zabari . I live at 8755 SW 131 ST. Miami, Fl 33176. I am a native of Israel. I am an artist. My art is recognized in the U.S and abroad.

I have known Mohamed Samhan for approximately 4 years. We have become friends. I find Mohamed to be an honest, decent, kind man with a good reputation.

I have heard that Mohamed has been arrested for possessing an illegal drug. I find this very hard to believe. That is very unlike him. He is an honest, family oriented man.

I am sure Mohamed will respect all conditions of a bond.

Thank you,


Avner Zabari
(305)232-3009

September 20, 2000

My name is Adam Tavakoly. I live at 8777 SW/ 29 ST. Miami, Fl 33156. I am a native of
Iran. I own a computer business around the corner from Mohamed Samhan.

I have known Mohamed Samhan for approximately 4 1/2 years. We have become friends.
I find Mohamed to be a kind, decent, honest man with a good reputation.

I have heard that Mohamed has been arrested for possessing an illegal drug. This is very
hard for me to believe. That is not like him. He is an honest  business man. He is also
very family oriented.

I am sure Mohamed will respect all conditions of a bond.

Thank you for your time,

Adam Tavakoly
(305)234-5555

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


THE UNITED STATES OF AMERICA, )
                              )          CASE NUMBER
              PLAINTIFF,      )          00-6211-CR-HURLEY
                              )
        VS.                   )
                              )
MOHAMMED SAMHAN,              )          THIS VOLUME:
                              )          PAGES 1 - 25
              DEFENDANT.      )
_____)

(TRANSCRIPT BY TAPE)


        TRANSCRIPT OF DETENTION HEARING HAD BEFORE THE

HONORABLE BARRY S. SELTZER, IN FORT LAUDERDALE, BROWARD

COUNTY, FLORIDA, ON AUGUST 3, 2000, IN THE ABOVE-STYLED

MATTER.


APPEARANCES:

FOR THE GOVERNMENT:   LARRY BARDFELD, A.U.S.A.

FOR THE DEFENDANT:    JOSE PUIG, ESQ.


CARL SCHANZLEH
OFFICIAL COURT REPORTER
U. S. COURTHOUSE
299 E. BROWARD BLVD., 202B
FORT LAUDERDALE, FLORIDA 33301
954 769-5488

1

2                    **TABLE OF CONTENTS**

3    **WITNESSES:**                **DIRECT   CROSS  REDIRECT  RECROSS**

4    SEAN O'CONNOR ......................... 15

5                    **INDEX TO EXHIBITS**

6    **EXHIBITS**                    **MARKED FOR          RECEIVED**
                               **IDENTIFICATION     IN EVIDENCE**

7    **DESCRIPTION**             **PAGE      LINE     PAGE      LINE**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (FORT LAUDERDALE, BROWARD COUNTY, FLORIDA;  AUGUST 3, 2000,

2   IN OPEN COURT.)

3           THE COURT:  LET ME TAKE A MOMENT TO WELCOME YOU

4   HERE TO THE COURTHOUSE, THIS BEING AUGUST THE 3RD, 2000,

5   MAGISTRATE COURT HEARINGS.

6           WE HAVE A PRETRIAL DETENTION HEARING SET FOR TEN

7   A.M.  LET ME GO AHEAD AND CALL OUR CASE.

8           UNITED STATES VERSUS MOHAMMED SAMHAN.

9           LET ME ASK COUNSEL TO STATE THEIR APPEARANCES.

10          MR. BARDFELD:  GOOD MORNING, YOUR HONOR, LARRY

11  BARDFELD FOR THE UNITED STATES.

12          THE COURT:  MR. BARDFELD.

13          MR. PUIG:  GOOD MORNING, YOUR HONOR, JOSE PUIG ON

14  BEHALF OF MR. SAMHAN.

15          THE COURT:  WELCOME.  PLEASE BE SEATED.

16          ALL RIGHT.  WE ARE HERE FOR PURPOSES OF A PRETRIAL

17  DETENTION HEARING AS I INDICATED.

18          ARE BOTH SIDES READY TO PROCEED?

19          MR. BARDFELD:  YES, YOUR HONOR.

20          MR. PUIG:  YES, YOUR HONOR.

21          THE COURT:  OKAY.  LET ME TURN TO THE GOVERNMENT

22  TO BEGIN.

23          MR. BARDFELD:  THANK YOU, YOUR HONOR.

24          YOUR HONOR, THE DEFENDANT, MOHAMMED SAMHAN, IS

25  CHARGED BY WAY OF INDICTMENT WITH CONSPIRACY TO POSSESS AND

1  DISTRIBUTE PSEUDOEPHEDRINE, WHICH IS A LIST ONE CHEMICAL AS

2  DEFINED IN TITLE 21, UNITED STATES CODE, SECTION 802,

3  KNOWING AND HAVING REASONABLE CAUSE TO BELIEVE THAT THE

4  LISTED CHEMICAL, THAT BEING PSEUDOEPHEDRINE, WOULD BE USED

5  TO MANUFACTURE A CONTROLLED SUBSTANCE, THAT IS,

6  METHAMPHETAMINE, A SCHEDULE TWO CONTROLLED SUBSTANCE.

7          IN ADDITION TO THE CONSPIRACY COUNT, MR. SAMHAN IS

8  CHARGED WITH 13 CODEFENDANTS IN THE CONSPIRACY, HE IS ALSO

9  CHARGED IN THE SUBSTANTIVE COUNT OF POSSESSION AND

10  DISTRIBUTION OF PSEUDOEPHEDRINE KNOWING IT IS GOING TO BE

11  USED TO MANUFACTURE METHAMPHETAMINE.

12          BEGINNING IN SEPTEMBER OF 1999, THOMAS NAROG BEGAN

13  RECEIVING EXTRAORDINARILY LARGE SHIPMENTS OF PSEUDOEPHEDRINE

14  FROM DRUG MANUFACTURES IN NEW YORK.  NAROG IS THE ONLY

15  EMPLOYEE OF SEASIDE PHARMACEUTICAL, A RECENTLY FORMED

16  PHARMACEUTICAL COMPANY IN SOUTH FLORIDA.  THE COMPANY HAS NO

17  OFFICE AND EXISTS ONLY IN THREE SEPARATE STORAGE UNITS AT A

18  PUBLIC STORAGE FACILITY.

19          MR. NAROG IS THE ONLY PERSON INVOLVED IN THIS

20  INDICTMENT WHO CAN OBTAIN THE PSEUDOEPHEDRINE FROM

21  MANUFACTURES BECAUSE HE IS THE ONLY DEA REGISTRANT AMONG THE

22  DEFENDANTS.

23          PSEUDOEPHEDRINE IS AN OVER-THE-COUNTER COLD

24  MEDICINE THAT IS NOT ILLEGAL TO POSSESS OR DISTRIBUTE.

25  HOWEVER, IT IS A PRECURSOR TO METHAMPHETAMINE AND IS USED TO

1   MANUFACTURE METHAMPHETAMINE USUALLY IN THE CLANDESTINE LABS

2   IN THE WESTERN PART OF THE COUNTRY.

3          IN THIS PARTICULAR INSTANCE THE DEFENDANTS WERE IN

4   POSSESSION OF MASSIVE QUANTITIES OF PSEUDOEPHEDRINE PILLS.

5   ON THREE SEPARATE OCCASIONS, TWO OF WHICH ARE CHARGED IN

6   SUBSTANTIVE COUNTS IN THE INDICTMENT AND A THIRD WHICH MAY

7   BE IF WE DO SUPERSEDE BUT IT WAS TOO RECENT.  MR. SAMHAN AND

8   A CODEFENDANT, MR. RABAH EL HADDAD, RECEIVED SHIPMENTS OF

9   PSEUDOEPHEDRINE FROM NAROG AND GHANDI JABER.  THE

10  PSEUDOEPHEDRINE WAS DRIVEN TO MIAMI WHERE EL HADDAD AND

11  MR. SAMHAN REPACKAGED IT AND THEN SHIPPED IT OUT TO THE WEST

12  COAST.

13         THE SHIPPING PACKAGES WERE LABELED AS BOOKS OR

14  SHAVERS OR SHOES BUT WAS NOT LABELED AS PSEUDOEPHEDRINE FOR

15  MEDICINE OR ANYTHING ALONG THOSE LINES.

16         THE COURT:  I AM SORRY, THEY REPACKAGED THE

17  PSEUDOEPHEDRINE AND LABELED IT WAS WHAT?

18         MR. BARDFELD:  AS EITHER SHOES OR BOOKS OR SHAVERS

19  AND NOT AS PSEUDOEPHEDRINE OR ANY KIND OF MEDICINE.

20         THE COURT:  ALL RIGHT.  AND THEY SHIPPED IT TO THE

21  WEST COAST?

22         MR. BARDFELD:  YES.  ON THE WEST COAST.

23         MR. EL HADDAD TRAVELED THERE TO MAKE CERTAIN THE

24  SHIPMENT OF PSEUDOEPHEDRINE MADE IT TO ITS DESTINATION.

25  PURSUANT TO A CONSENT SEARCH OF MR. SAMHAN'S RESIDENCE CLOSE

1   TO 150 POUNDS OF PSEUDOEPHEDRINE WAS FOUND IN SIX SEPARATE

2   BOXES.

3          AND JUST SO THE COURT IS AWARE, I HAVE ONE OF

4   THOSE BOXES.  I THINK IT WEIGHS APPROXIMATELY 62 POUNDS

5   FILLED WITH PSEUDOEPHEDRINE PILLS.

6          THE COURT:  AND YOU SAID HOW MANY POUNDS WERE IN

7   THE RESIDENCE?

8          MR. BARDFELD:  APPROXIMATELY 144.

9          AND HERE IS ONE OF THE BAGGIES OF LOOSE

10  PSEUDOEPHEDRINE PILLS, AND THERE ARE PROBABLY 10 OR 12 IN

11  HERE BUT FOR A TOTAL OF 62 POUNDS IN THIS PARTICULAR BOX,

12  AND ANOTHER BOX ABOUT THE SAME SIZE, AND THERE WERE FOUR

13  OTHER BOXES FOUND THERE EACH WEIGHING ABOUT FIVE POUNDS.

14         THE COURT:  THAT'S ABOUT 144 POUNDS WERE

15  RECOVERED?

16         MR. BARDFELD:  APPROXIMATELY, YES.

17         ON THIS PARTICULAR INSTANCE, YOUR HONOR, THE

18  DEFENDANT IS A RISK OF FLIGHT AND DANGER TO THE COMMUNITY

19  AND THE UNITED STATES WOULD RELY ON THE REBUTTABLE

20  PRESUMPTION IN THIS CASE.

21         THE DEFENDANT HAS BEEN CHARGED WITH A SUBSTANTIVE

22  OFFENSE OF 21, USC 841(D)(2), WHICH IS A STATUTORY MAXIMUM

23  OF 20 YEARS, AND THE REBUTTABLE PRESUMPTION WOULD APPLY IN

24  THIS PARTICULAR INSTANCE.

25         THE COURT:  WHAT ARE HIS GUIDELINES?

1        MR. BARDFELD:  THE GUIDELINES WOULD BE 97 TO A 120

2  MONTHS.  IT IS A LEVEL 30 OFFENSE.

3        THE COURT:  97 TO --

4        MR. BARDFELD:  TO A 121.  IT IS A LEVEL 30

5  OFFENSE.  ANYTHING OVER 20 KILOGRAMS, WHICH IS APPROXIMATELY

6  44 POUNDS OF PSEUDOEPHEDRINE IS LEVEL 30.  THAT'S TOP OF THE

7  GUIDELINES FOR PSEUDOEPHEDRINE.

8        IN THIS PARTICULAR CASE, AT LEAST AS THE

9  SUBSTANTIVE COUNTS, WE HAVE AT LEAST 150 OR 140 IN THIS

10  DEFENDANT'S RESIDENCE.  ADDITIONALLY, THERE WAS ANOTHER 220

11  POUNDS SEIZED OUT IN CALIFORNIA WHEN MR. HADDAD WAS

12  ARRESTED, PLUS ALL OF THE OTHERS INVOLVED IN THIS

13  CONSPIRACY.  BUT AS IT RELATES TO THIS PARTICULAR DEFENDANT

14  JUST LOOSE PILLS WE HAVE OVER 300 POUNDS OF LOOSE PILLS.

15        NOW, THE PARTICULAR FACTS GIVING RISE TO THE

16  INDICTMENT IN THIS CASE AND FOR WHICH THE UNITED STATES IS

17  ASKING DETENTION IS BETWEEN SEPTEMBER OF 1999 AND JUNE OF

18  2000, NAROG AT SEASIDE PHARMACEUTICAL RECEIVED APPROXIMATELY

19  36,000 GROSS POUNDS OF PSEUDOEPHEDRINE.  NOW, THAT IS NOT

20  JUST THE PILLS.  THAT WOULD BE THE PILLS IN THE BOTTLES AND

21  THE BOXES, BUT IT IS A TOTAL OF 36,000 GROSS POUNDS.

22        SINCE THE PSEUDOEPHEDRINE HAD BEEN DELIVERED TO

23  SEASIDE PHARMACEUTICAL WHICH EXISTS ONLY AS A STORAGE

24  WAREHOUSE, AGENTS HAD COORDINATED AT LEAST SEVEN CONTROLLED

25  DELIVERIES OF PSEUDOEPHEDRINE FROM CALIFORNIA, OREGON, AND

1   ELSEWHERE ON THE WEST COAST IN WHICH THIS PSEUDOEPHEDRINE

2   WAS BEING DELIVERED TO CLANDESTINE METHAMPHETAMINE LABS

3   WHERE IT IS BEING USED TO MANUFACTURE METHAMPHETAMINE.

4           THREE PARTICULAR SHIPMENTS OF NAROG'S

5   PSEUDOEPHEDRINE, OR THAT NAROG RECEIVED WERE ACTUALLY

6   RECEIVED BY MR. SAMHAN AND MR. EL HADDAD.  THE FIRST ONE WAS

7   JUNE 1ST OF 2000 WHERE AGENTS OBSERVED MR. NAROG, MR. GHANDI

8   JABER AND TWO CODEFENDANTS, MOTLAQ JABER AND READ NASER

9   ALDIN, ARRIVED AT SEASIDE PHARMACEUTICALS.

10          THE COURT:  THE FIRST ONE, I AM LOOKING AT THE

11  COMPLAINT AFFIDAVIT, IS JUNE 1ST.

12          MR. BARDFELD:  YES.

13          THE COURT:  ALL RIGHT.  ON JUNE 1ST.

14          I'M SORRY.  START AGAIN.

15          MR. BARDFELD:  JUNE 1ST NAROG, GHANDI JABER,

16  MOTLAQ JABER, AND READ NASER ALDIN ARRIVED AT SEASIDE

17  PHARMACEUTICALS WHERE AGENTS OBSERVED THOSE INDIVIDUALS MOVE

18  BOXES OF PSEUDOEPHEDRINE FROM ONE WAREHOUSE TO A SECOND

19  STORAGE FACILITY IN THE SAME COMPLEX.  THEY MOVED IT FROM

20  UNIT 206 SLASH 207 TO UNIT 1352.

21          THE COURT:  ALL RIGHT.

22          MR. BARDFELD:  AT THE TIME THEY WERE MOVING IT IN

23  A U-HAUL TRUCK WAS PARKED AT A DUNKIN' DONUTS NEAR THE

24  STORAGE FACILITY.  MR. EL HADDAD EXITED THAT DUNKIN' DONUTS

25  AND GOT INTO THE U-HAUL AND DROVE TOWARD THAT STORAGE

1  FACILITY.

2         MR. SAMHAN WAS IN THE DUNKIN' DONUTS.  AND WHAT

3  HAPPENED IS, AFTER GHANDI JABER FINISHED LOADING SOME OF THE

4  BOXES INTO THE U-HAUL HE LEFT THE STORAGE FACILITY AND MET

5  AT THE DUNKIN' DONUTS.  AT THAT DUNKIN' DONUTS MR. GHANDI

6  JABER AND MR. SAMHAN WERE SEEING MEETING AND TALKING.

7         EL HADDAD LEAVES THE DUNKIN' DONUTS PARKING LOT IN

8  THE U-HAUL DRIVES TO THE STORAGE FACILITY.  WHEN HE DOES

9  THAT MR. SAMHAN LEAVES THE DUNKIN' DONUTS AND GETS IN HIS

10 FORD EXPLORER.

11         AS HE DRIVES OUT OF THE DUNKIN' DONUTS AND DRIVES

12 AROUND THE STORAGE FACILITY, HE IS LOOKING AROUND AS IF HE

13 IS LOOKING FOR SURVEILLANCE.  IN FACT, HE EVEN PARKS HIS

14 VEHICLE BEHIND ONE OF THE SURVEILLANCE VEHICLES THAT THE

15 AGENTS HAD PARKED TO OBSERVE WHAT WAS GOING ON AT THE

16 WAREHOUSE.

17         WHILE MR. SAMHAN IS DRIVING AROUND THE AREA

18 LOOKING FOR SURVEILLANCE, MR. EL HADDAD HAS DRIVEN TO THE

19 WAREHOUSE WHERE HE HAS LOADED 200 BOXES OF PSEUDOEPHEDRINE

20 INTO THE BACK OF THE U-HAUL.  MR. HADDAD AND THE U-HAUL THEN

21 LEAVES TOWARD MIAMI.  MR. SAMHAN FOLLOWS IN HIS FORD

22 EXPLORER.  THEY TRAVEL SOUTH TOWARD MIAMI WHERE THEY DRIVE

23 TO A PRIVATE POSTAL FACILITY KNOWN AS PAC MAIL.  I GUESS IT

24 IS LIKE A MAILBOX TYPE OF PLACE.

25         THE COURT:  A PACKING FACILITY?

1          MR. BARDFELD:  YES.  AT THE PAC MAIL STORE SOME OF

2   THE BOXES OF PSEUDOEPHEDRINE ARE REPACKAGED IN LARGER BOXES

3   FOR EASIER SHIPMENT.

4          THE COURT:  REPACKAGED IN SMALLER BOXES?

5          MR. BARDFELD:  LARGER BOXES.

6          THE COURT:  LARGER BOXES?

7          MR. BARDFELD:  YES, FOR EASIER SHIPPING.

8          MR. SAMHAN THEN PLACES 15 TO 20 BOXES OF THE

9   PSEUDOEPHEDRINE IN THE BACK OF HIS EXPLORER.  HE LEAVES AND

10  GOES TO A NEARBY SHOPPING PLAZA.

11         MR. EL HADDAD LEAVES THE PAC MAIL IN A U-HAUL AND

12  TAKES APPROXIMATELY 15 OF THE LARGER BOXES THAT HE AND

13  MR. SAMHAN HAD PACKAGED AND DRIVES THEM TO A FEDERAL EXPRESS

14  OFFICE WHERE THEY ARE SHIPPED TO LA SALLE, S-A-L-L-E, SALVA,

15  S-A-L-V A, BEACH CALIFORNIA.  THE SENDER WAS LISTED AS

16  SHAVERS PLUS COSMETICS ON THE FEDERAL EXPRESS SHIPPING

17  LABEL.

18         THIS LOAD OF PSEUDOEPHEDRINE MADE IT THROUGH TO

19  CALIFORNIA AND WAS NOT SEIZED BY LAW ENFORCEMENT OFFICIALS.

20  SINCE THE ENTIRE SHIPMENT OF PSEUDOEPHEDRINE HAD NOT BEEN

21  SENT, AGENTS HAD BEEN DOING SURVEILLANCE AT THE PAC MAIL AND

22  KNEW THAT THE TOTAL AMOUNT HAD NOT BEEN SENT.

23         THEY REESTABLISHED SURVEILLANCE THE NEXT DAY AT

24  THE SAME PAC MAIL FACILITY WHERE THEY OBSERVED MR. HADDAD

25  LOAD THE REMAINING PACKAGES INTO THE BACK OF THE U-HAUL

1   AGAIN.  HE THEN DROVE TO STERLING TRANSPORTATION WHERE THE

2   PACKAGES WERE AGAIN SHIPPED TO LA SALLE, CALIFORNIA.  HE

3   SENT 22 MORE PACKAGES THAT TIME.

4         A FEW DAYS LATER MR. HADDAD TRAVELED TO CALIFORNIA

5   TO FACILITATE THE TRANSFER OF THIS PSEUDOEPHEDRINE.  IN ON

6   OR ABOUT JUNE 7TH, MR. HADDAD MET WITH A CONFIDENTIAL

7   INFORMANT IN SAN JOSE, CALIFORNIA, WHERE DURING THAT MEETING

8   HE STATED HE WAS LOOKING FOR THE RAT IN THE ORGANIZATION,

9   REFERRING TO PREVIOUS ARRESTS AND SEIZURES OF

10  PSEUDOEPHEDRINE THAT HAD TAKEN PLACE ON THE WEST COAST.

11        A SECOND LOAD ON 6-15 OF THE YEAR 2000 WAS

12  OBTAINED BY MR. RABAH EL HADDAD AND MOHAMMED SAMHAN FROM

13  MR. NAROG AND SEASIDE PHARMACEUTICAL.  THAT PSEUDOEPHEDRINE

14  WAS DELIVERED BY A COMMERCIAL CARRIER AGAIN TO THE PAC MAIL

15  FACILITY, THE SAME PAC MAIL FACILITY THEY HAD BEEN AT IN

16  MIAMI EARLIER WHERE MR. EL HADDAD AND MR. SAMHAN MET.

17        AT THE PAC MAIL FACILITY MR. EL HADDAD AND

18  MR. SAMHAN REPACKAGED THE PSEUDOEPHEDRINE INTO 27 LARGER

19  CARDBOARD BOXES WHICH WERE THEN LOADED ONTO A RYDER TRUCK

20  AND DELIVERED IT TO TARGET LOGISTICS IN MIAMI INTERNATIONAL

21  AIRPORT.

22        THOSE 27 BOXES WERE SHIPPED TO SALEM, OREGON, AND

23  LABELED AS SHOES BEING SHIPPED TO SAL SHOES IN SALEM,

24  OREGON, AND, A FEW DAYS LATER MR. EL HADDAD ARRIVES IN

25  PORTLAND, OREGON.  THAT PSEUDOEPHEDRINE IN THE 27 BOXES WAS

1   SEIZED BY LAW ENFORCEMENT IN OREGON BEFORE IT REACHED ITS

2   INTENDED DESTINATION, AND IT WAS A TOTAL OF 2,400 GROSS

3   POUNDS OF PSEUDOEPHEDRINE.  AGAIN, THE GROSS POUNDS WOULD

4   INCLUDE THE WEIGHT OF THE BOTTLE, THE WEIGHT OF THE

5   PACKAGING, THE WEIGHT OF THE BOXES AND THEY WERE NOT JUST

6   LOOSE PILLS.

7          THE COURT:  THESE ARE BY AGENTS IN OREGON?

8          MR. BARDFELD:  YES.

9          THE THIRD LOAD ON JULY 21ST, 2000, WAS TRANSPORTED

10  FROM NAROG'S STORAGE FACILITY TO PAC MAIL BY COMMERCIAL

11  CARRIER.  AGAIN, MR. SAMHAN AND EL HADDAD ARRIVED AND

12  REPACKAGED THE BOXES INTO LARGER SHIPPING BOXES.  THOSE

13  BOXES ARE THEN PLACED IN MR. SAMHAN'S EXPLORER, AND WE

14  BELIEVE -- AND A VAN BELIEVED TO BE OWNED BY MR. HADDAD'S

15  WIFE.

16          AGENTS ATTEMPTED TO DO SURVEILLANCE AND FOLLOWED

17  THOSE VEHICLES BUT THE DRIVERS ARE DOING A LOT OF

18  COUNTERSURVEILLANCE AT THAT TIME.  FOR EXAMPLE, INSTEAD OF

19  DRIVING STRAIGHT TO A RESIDENCE WHAT THEY DO IS, THEY WOULD

20  DRIVE AROUND THE BLOCK THREE OR FOUR TIMES TO SEE IF ANYONE

21  WAS FOLLOWING THEM AND THEN THEY WOULD DRIVE IN -- AND THEN

22  THEY WOULD DRIVE INTO THE RESIDENCE AFTER MAKING SURE NO ONE

23  WAS FOLLOWING THEM.

24          THE COURT:  AND THAT WAS BOTH MR. SAMHAN AND

25  MR. HADDAD THAT DID THAT?

1          MR. BARDFELD:  I BELIEVE SO.

2          A FEW DAYS LATTER PART OF THAT SHIPMENT THAT HAD

3    ARRIVED ON JULY 21ST IS SENT TO CALIFORNIA, AND MR. HADDAD

4    ARRIVES IN CALIFORNIA AGAIN TO MAKE SURE -- CERTAIN THE

5    PSEUDOEPHEDRINE ARRIVES SAFELY.

6          AT THAT POINT HE IS ARRESTED AS HE IS ATTEMPTING

7    TO ASSIST IN THE LOAD, AND AGENTS SEIZED 220 POUNDS OF LOOSE

8    PSEUDOEPHEDRINE PILLS.

9          MEANWHILE MR. SAMHAN IS ARRESTED IN MIAMI.  HE

10   GIVES CONSENT TO SEARCH HIS RESIDENCE.  INSIDE THE RESIDENCE

11   AGENTS DISCOVER TWO BOXES WEIGHING APPROXIMATELY 62 POUNDS

12   EACH WITH NOTHING BUT LOOSE PSEUDOEPHEDRINE PILLS.  AGENTS

13   ALSO DISCOVERED ANOTHER FOUR BOXES EACH WEIGHING --

14   APPROXIMATE WEIGHT OF ABOUT FIVE POUNDS OF LOOSE PILLS FOR A

15   TOTAL OF 144 POUNDS OF LOOSE PILLS.

16         AGAIN, JUST SO THE COURT CAN HAVE SOME IDEA WHAT

17   WE ARE TALKING ABOUT, WE HAVE NOTHING BUT PILLS THAT HAD

18   BEEN TAKEN OUT OF THE BOTTLES.  THIS IS JUST, YOU KNOW,

19   THREE OF THE BAGS.  I THINK THERE ARE PROBABLY MAYBE 20 OR

20   SO IN THERE.

21         THE COURT:  THEY COME FROM THE MANUFACTURER IN

22   BOTTLES?

23         MR. BARDFELD:  YES.

24         THE OTHER COMMENT I WOULD MAKE IS, AND THIS IS NOT

25   AS RELATES TO THE FACTS IN THE CASE BUT AS IT RELATES TO THE

14

1   DEFENDANT'S POSSIBLE TIES TO THE COMMUNITY.

2          AS YOU CAN SEE, MR. SAMHAN WAS BORN IN PALESTINE,

3   I BELIEVE -- NO, HE WAS BORN IN WEST BANK JORDAN, AND HE IS

4   A JORDANIAN NATIONAL.  SO I THINK -- LET'S SEE HERE.  HE

5   REPORTS HE IS A JORDANIAN NATIONAL, ENTERED THE U. S. IN

6   1986 AS A LEGAL ALIEN.

7          AN AUTOMATED STATUS CHECK ON INS INDICATES HE WAS

8   BORN IN PALESTINE AND ENTERED IN 1990.  SO THERE IS SOME

9   DISCREPANCY WHEN HE CAME HERE AND WHERE HE IS ACTUALLY FROM.

10  BUT HAVING SAID THAT, I BELIEVE THE DEFENDANT IS IN

11  POSSESSION OF A JORDANIAN PASSPORT AND HAS TRAVELED THERE,

12  AT LEAST THAT'S ACCORDING TO HIM, ON THREE OCCASIONS.

13         THE OTHER THING I WOULD MENTION TO THE COURT AS IT

14  RELATES TO MR. SAMHAN IS, MR. SAMHAN DENIED -- WHEN

15  QUESTIONED AT THE TIME OF HIS ARREST HE DENIED EVER BEING AT

16  THE PAC MAIL STORE.  HE DENIED EVER BEING AT THE STORAGE

17  FACILITY EVEN THOUGH THE AGENTS HAD SEEN HIM THERE ON

18  NUMEROUS OCCASIONS AS THEY WERE DOING THEIR OWN

19  SURVEILLANCE.  AND THAT WOULD BE THE FACTUAL PROFFER.

20         THE COURT:  THE STORAGE FACILITY BEING NAROG'S?

21         MR. BARDFELD:  YES.

22         THE COURT:  ALL RIGHT.  VERY WELL.

23         MR. PUIG, DO YOU WISH TO CROSS-EXAMINE THE

24  GOVERNMENT'S AGENT?

25         MR. PUIG:  YES, YOUR HONOR.

1          THE COURT:  LET ME ASK THE AGENT TO APPROACH AND

2    PLEASE BE SWORN.

3          PLEASE RAISE YOUR RIGHT HAND.

4          DO YOU SOLEMNLY SWEAR TO TELL THE TRUTH THE WHOLE

5    TRUTH AND NOTHING BUT THE TRUTH?

6          THE WITNESS:  I DO.

7          THE COURT:  PLEASE BE SEATED.

8          ONCE YOU GET COMFORTABLE IF YOU WOULD PLEASE STATE

9    YOUR NAME AND SPELL YOUR LAST NAME.

10          THE WITNESS:  MY NAME IS SEAN O'CONNOR.  MY LAST

11    NAME IS SPELLED O APOSTROPHE C-O-N-N-O-R.

12          THE COURT:  ALL RIGHT.

13          MR. PUIG, YOU MAY CROSS-EXAMINE.

14                    **SEAN O'CONNOR**,

15    BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

16                   **CROSS EXAMINATION**

17    BY MR. PUIG:

18    Q.    MR. O'CONNOR, WE JUST HEARD EVERYTHING THAT WAS ON THE

19    COMPLAINT.  GOOD MORNING.

20          AS TO MR. SAMHAN'S ROLE IN THE SCOPE OF THIS,

21    WOULD YOU CONSIDER IT A MINOR ROLE?

22    A.    NO, NOT AT ALL.

23    Q.    WELL, ACCORDING TO WHAT I HAVE HEARD THIS MORNING AND

24    WHAT I READ IN THE COMPLAINT, THE ONLY THING THAT

25    (INAUDIBLE) FOR THE GOVERNMENT HAS SO FAR SAID THAT TIES

16

```
 1  MR. SAMHAN INTO MR. NAROG'S ACTIONS IS, WE DON'T HAVE
 2  MR. NAROG HERE OR MR. EL HADDAD (INAUDIBLE) IS APPROXIMATELY
 3  400 POUNDS, ALTHOUGH THERE WAS 36,000 POUNDS WERE SEIZED BY
 4  MR. NAROG, IS THAT RIGHT?
 5  A.    WELL, WE ARE SAYING 400 POUNDS OF LOOSE PILLS.  IT IS
 6  NOT THE EQUIVALENT TO THE GROSS WEIGHT THAT COMES IN THE
 7  BOXES AND THE BOTTLES.  THOSE ARE PURE PILLS, LOOSE PILLS IN
 8  BAGGIES THAT HAD BEEN REPACKAGED.
 9  Q.    WHEN MR. SAMHAN WAS PICKED UP WAS HE COMPLETELY
10  COOPERATIVE?
11  A.    I WAS NOT AT THE RESIDENCE WHEN HE WAS ARRESTED, BUT TO
12  MY UNDERSTANDING HE WAS.
13  Q.    AND HE DID CONSENT TO A SEARCH.  HE DIDN'T GIVE YOU ANY
14  TROUBLE?
15  A.    LIKE I SAID, I WASN'T THERE.  BUT IT WAS MY
16  UNDERSTANDING THERE WAS NO PROBLEM.
17          MR. PUIG:  NO FURTHER QUESTIONS.
18          THE COURT:  ANY REDIRECT?
19          MR. BARDFELD:  NO, YOUR HONOR.
20          THE COURT:  ALL RIGHT.  AGENT, LET ME ASK, 400
21  POUNDS THAT COUNSEL WAS REFERRING TO, WHAT IS THAT, IS THAT
22  THE WEIGHT OF THE PILLS THAT MR. SAMHAN IS ALLEGED TO HAVE
23  REMOVED OR TAKEN FROM -- TAKEN POSSESSION FROM MR. NAROG?
24          THE WITNESS:  JUDGE, I BELIEVE THAT 400 POUNDS IS
25  THAT LAST PARTICULAR LOAD THAT MR. BARDFELD WAS TALKING
```

1    ABOUT.

2              THE COURT:  THE LAST LOAD, THE THIRD LOAD.

3              THE WITNESS:  YES, SIR.  THE ONE WHERE

4    SURVEILLANCE WAS NOT ABLE TO BE MAINTAINED.

5              THE COURT:  WHAT IS THE -- DO YOU KNOW THE -- OR

6    DO YOU HAVE ANY WAY OF KNOWING WHAT THE TOTAL WEIGHT IS OF

7    THE PILLS THAT MR. SAMHAN IS ALLEGED TO HAVE RECEIVED FROM

8    MR. NAROG?

9              THE COURT:  THERE.

10             THE WITNESS:  THERE WERE -- THIS LAST PARTICULAR

11   LOAD THAT WE ARE TALKING ABOUT, THERE WERE FOUR LARGE

12   PALLETS THAT WERE REMOVED FROM THE WAREHOUSE IN

13   FORT LAUDERDALE TAKEN TO THE PAC MAIL, IN EXCESS OF SEVERAL

14   THOUSAND POUNDS GROSS WEIGHT EASY.

15             THE PILLS THAT HAD BEEN REPACKAGED THAT HE IS

16   REFERRING TO, THERE WAS FIVE BOXES THAT WAS SENT OUT TO

17   CALIFORNIA THAT WE ARE MADE AWARE OF ON JULY 26TH.  SHORTLY

18   THEREAFTER, JULY 29TH, WE ARREST MR. SAMHAN AT HIS RESIDENCE

19   THERE IS 220 POUNDS OF LOOSE PILLS, AND THEN THERE IS AN

20   ADDITIONAL 220 POUNDS OF LOOSE PILLS IN CALIFORNIA THAT

21   MR. HADDAD RECEIVES.

22             THE COURT:  I THOUGHT AT HIS RESIDENCE IT WAS --

23   THE QUANTITY OF THOSE PILLS WAS 140 POUNDS.

24             MR. PUIG:  144 POUNDS IS WHAT I THINK I HEARD,

25   YOUR HONOR.

1          THE WITNESS:  NO, YOU ARE CORRECT, TWO BOXES, 62

2    POUNDS EACH, AND THEN FIVE ADDITIONAL BAGGIES -- OR FOUR OR

3    FIVE ADDITIONAL BAGGIES, FIVE POUNDS EACH.

4          THE COURT:  SO IT IS 144 POUNDS.

5          THE WITNESS:  CORRECT.

6          THE COURT:  ALL RIGHT.  THE TOTAL -- DO YOU HAVE

7    ANY -- CAN YOU GIVE ME A GOOD FAITH ESTIMATE, A RELIABLE

8    ESTIMATE OF THE TOTAL WEIGHT OF THE PSEUDOEPHEDRINE THAT --

9    EITHER GROSS WEIGHT OR NET WEIGHT THAT MR. SAMHAN RECEIVED

10   FROM MR. NAROG ON THE THREE OCCASIONS?

11         THE WITNESS:  THE FIRST LOAD ON JUNE 1ST, THE --

12   THERE WAS APPROXIMATELY 1.7 MILLION DOSAGE UNITS.  THAT

13   WOULD BE 1.7 MILLION TABLETS.

14         AS FAR AS THE EXACT WEIGHT, I'M NOT SURE OF THAT,

15   JUDGE.

16         THE COURT:  ALL RIGHT.

17         MR. BARDFELD:  YOUR HONOR, IF I MIGHT HELP, AND I

18   AM NOT TRYING TO TESTIFY FOR HIM, BUT IT IS MY UNDERSTANDING

19   IT WAS APPROXIMATELY 900 POUNDS GROSS WEIGHT FROM THE FIRST

20   SHIPMENT IN CALIFORNIA, AND THEN APPROXIMATELY 2,400 POUNDS

21   GROSS WEIGHT ON THE SHIPMENT TO SALEM, OREGON.

22         THE COURT:  AND THE THIRD SHIPMENT WAS HOW MANY

23   GROSS POUNDS, THE THIRD DELIVERY?

24         MR. BARDFELD:  I DON'T KNOW THE GROSS AMOUNT

25   BUT --

1      THE WITNESS:  THE ONLY WEIGHT WE DO HAVE WOULD BE

2  THE WEIGHT OF JUST PILLS, AND THAT WOULD BE THE 144 PLUS THE

3  220 THAT WAS SENT OUT TO CALIFORNIA SEVERAL DAYS PRIOR.

4      THE COURT:  ALL RIGHT.

5      MR. BARDFELD:  BUT I THINK BASED ON THE NUMBER OF

6  PALLETS THAT HAD BEEN TRANSFERRED OR SHIPPED, IT IS GOING TO

7  BE A COMPARABLE AMOUNT, SOMEWHERE AROUND 1,000 TO 2,000

8  POUNDS GROSS WEIGHT OF THIS.

9      THE COURT:  ALL RIGHT.  THANK YOU.

10      ALL RIGHT.  DOES THE GOVERNMENT REST?

11      MR. BARDFELD:  YES, YOUR HONOR.

12      THE COURT:  LET ME TURN TO THE DEFENSE.

13      FIRST WITH REGARD TO THE PRETRIAL SERVICES REPORT,

14  ARE THERE ANY ERRORS OR ANY INACCURACIES IN THE REPORT THAT

15  THE DEFENSE WISHES TO NOTE?

16      MR. PUIG:  YOUR HONOR, IF I MIGHT ADD A LETTER

17  THAT I SENT TO THE GOVERNMENT, I MADE A COPY FOR YOUR HONOR

18  THAT SHOWS -- OUTLINES THE TIES TO THE COMMUNITY.

19      THE COURT:  ALL RIGHT.  I WILL BE HAPPY TO TAKE A

20  LOOK AT THAT IN ONE MOMENT.  BUT FIRST IN REGARD TO THE

21  PRETRIAL SERVICES REPORT ARE THERE ANY ERRORS OR ANY

22  INACCURACIES IN THE REPORT?

23      MR. PUIG:  THERE IS JUST ADDITIONAL INFORMATION

24  THAT I HAVE IN THIS LETTER.

25      THE COURT:  ARE THERE ANY ERRORS IN THE REPORT?

20

1          MR. PUIG:  NO, YOUR HONOR.

2          THE COURT:  LET ME TAKE A LOOK AT THE LETTER.

3          (DOCUMENT TENDERED)

4          THE COURT:  ALL RIGHT.  VERY WELL.

5          DEBBIE, JUST MARK THIS AS AN EXHIBIT THEN FOR THE

6    RECORD.

7          MR. PUIG:  THAT OUTLINES PRETTY WELL THE TIES TO

8    THE COMMUNITY, YOUR HONOR, AS FAR AS BROTHERS, SISTERS,

9    NIECES, NEPHEWS, GRAND NIECES.  THIS IS A MAN THAT HAS

10   BASICALLY MADE HIS LIFE HERE.

11         I AM HOLDING HIS PASSPORT.  HIS PASSPORT IS IN

12   FACT EXPIRED.  HE HAS HAD NO INTENTIONS OF LEAVING THIS

13   COUNTRY.

14         THE GOVERNMENT MENTIONED THAT HE HAS BEEN HOME A

15   FEW TIMES.  PEOPLE DO GO HOME AND THEY MIGHT GO TO A WEDDING

16   OR SOMETHING OF THIS SORT, BUT HE HAS ALWAYS -- HE HAS LIVED

17   HERE FOR QUITE A LENGTH AMOUNT OF TIME, ESTABLISHED

18   BUSINESSES HERE, HIS FAMILY HAS ESTABLISHED BUSINESSES HERE,

19   THEY HAVE HAD CHILDREN HERE, THEY HAVE HAD GRANDCHILDREN

20   HERE.  LIKE I SAID, HIS TIES TO THE COMMUNITY ARE VERY

21   SIGNIFICANT I THINK.  HIS FAMILY IS HERE PRESENT IN THE

22   COURTROOM.

23         THE COURT:  ALL RIGHT.  DOES THE DEFENSE WISH TO

24   PRESENT ANY EVIDENCE, TESTIMONIAL OR OTHERWISE?

25         MR. PUIG:  AS TO THE CASE, YOUR HONOR, I WOULD

1  REALLY RATHER NOT TRY THE CASE TODAY.

2        THE COURT:  ALL RIGHT.

3        MR. PUIG:  THANK YOU, YOUR HONOR.

4        THE COURT:  VERY WELL.  LET'S PROCEED TO ARGUMENT

5  THEN.

6        FIRST FROM THE GOVERNMENT.

7        MR. BARDFELD:  JUDGE, I WOULD SIMPLY SAY THAT

8  BASED THE REBUTTABLE PRESUMPTION IN THIS CASE, BASED ON THE

9  SHEER AMOUNT OF PSEUDOEPHEDRINE WE ARE TALKING ABOUT.  I

10 MEAN, THERE IS NO LEGITIMATE REASON FOR PILLS TO BE LIKE

11 THIS UNLESS IT IS BEING SHIPPED OUT TO CALIFORNIA TO BE MADE

12 INTO METHAMPHETAMINE.

13       IF IT WAS BEING USED AS COLD MEDICINE IT WOULD

14 STILL BE IN ITS BOTTLE FORM, BUT TO HAVE THIS MUCH LOOSE

15 PSEUDOEPHEDRINE IT IS GOING TO BE USED TO MANUFACTURE

16 METHAMPHETAMINE.

17       THE DEFENDANT HAS TIES -- HAS TIES TO THE MIDDLE

18 EAST.  IT IS CERTAINLY A CONCERN OF OURS.  THE DEFENDANT IS

19 LOOKING AT SOME SERIOUS JAIL TIME IN THIS CASE.  IT IS A

20 STRONG CASE AGAINST THE DEFENDANT, AND I WOULD SIMPLY SAY

21 BASED ON THE REBUTTABLE PRESUMPTION AND THE FACTS IN THIS

22 CASE THE DEFENDANT IS A RISK OF FLIGHT AND DANGER TO THE

23 COMMUNITY AND SHOULD BE HELD IN PRETRIAL DETENTION.

24       THE COURT:  AND FROM THE DEFENSE, MR. PUIG, ANY

25 FURTHER ARGUMENT?

1          MR. PUIG:  JUST THE FACT, YOUR HONOR, THAT --

2          THE COURT:  I SHOULD HAVE ASKED ALSO, WE NEED TO

3   PICK IT UP ON THE AUDIOTAPE.  THE COURT REPORTERS THAT HAVE

4   TRANSCRIBED THESE OFTEN REMIND ME THAT WE MISS SOME OF IT.

5          MR. PUIG:  AGAIN, YOUR HONOR, I AM NOT HERE TO TRY

6   THE CASE TODAY, BUT IF WE WERE GOING TO HOLD ANYBODY AND

7   EVERYBODY THAT HAD -- THERE WAS A REBUTTABLE PRESUMPTION NO

8   ONE WOULD GET OUT.

9          MY CLIENT HAS SIGNIFICANT TIES.  HE DESERVES THE

10  RIGHT TO BE OUT AND TRY THIS CASE FROM THE OUTSIDE.  THAT'S

11  WHY WE HAVE PRETRIAL RELEASE.  PRETRIAL SERVICES IN FACT HAS

12  RECOMMENDED RELEASE, AND MY CLIENT HAS NO OBJECTION TO ALL

13  THE REQUIREMENTS OF RELEASE RECOMMENDED BY PRETRIAL

14  SERVICES.

15         THE COURT:  ALL RIGHT.  LET ME THANK THE

16  ATTORNEYS, MR. PUIG ON BEHALF OF THE DEFENSE AND

17  MR. BARDFELD ON BEHALF OF THE GOVERNMENT, FOR PRESENTING

18  THEIR ARGUMENTS WELL ON BEHALF OF THEIR RESPECTIVE CLIENTS.

19         THE COURT IS GOING TO GO AHEAD AND GRANT THE

20  GOVERNMENT'S PETITION BOTH ON GROUNDS OF FLIGHT AND DANGER

21  TO THE COMMUNITY AND WILL FOLLOW WITH A WRITTEN ORDER.

22         LET ME ASK WHETHER EITHER THE GOVERNMENT OR THE

23  DEFENSE HAS ANY OTHER MATTERS PERTAINING TO MR. SAMHAN THAT

24  THEY WISH TO RAISE.

25         MR. BARDFELD:  NOT FROM THE GOVERNMENT, YOUR

```
 1   HONOR.

 2           MR. PUIG:  NOT FROM THE DEFENSE.

 3           THE COURT:  MR. PUIG, WILL YOU BE ENTERING A

 4   PERMANENT APPEARANCE?

 5           MR. PUIG:  NOT TODAY, YOUR HONOR.

 6           THE COURT:  DO YOU KNOW WHEN YOU WILL BE IN A

 7   POSITION TO KNOW WHETHER OR NOT YOU WILL?

 8           MR. PUIG:  WITHIN THE NEXT WEEK, YOUR HONOR, I

 9   SHOULD KNOW.

10           THE COURT:  ALL RIGHT.

11           DEBBIE, WHAT DATE DO WE HAVE SET FOR THE

12   ARRAIGNMENT?

13           THE CLERK:  (INAUDIBLE).

14           THE COURT:  ALL RIGHT.  THE ARRAIGNMENT IS SET FOR

15   AUGUST 10TH SO I GUESS THAT'S NEXT THURSDAY.

16           AS YOU KNOW, IT IS THE COURT'S POLICY NOT TO

17   PERMIT A DEFENDANT TO GO FORWARD WITH THE ARRAIGNMENT UNTIL

18   HE DOES HAVE PERMANENTLY RETAINED COUNSEL.  SO HOPEFULLY IF

19   WE CAN HAVE THAT RESOLVED BY THEN.

20           MR. PUIG:  IT WILL BE RESOLVED BY THEN, YOUR

21   HONOR.

22           THE COURT:  ALL RIGHT.

23           MR. SAMHAN, DO YOU HAVE ANY QUESTIONS THAT I CAN

24   ANSWER EITHER ABOUT WHAT WE HAVE DONE TODAY OR ABOUT WHAT

25   WILL BE OCCURRING NEXT IN YOUR CASE?
```

1        THE DEFENDANT:  NO, NO THANK YOU.

2        THE COURT:  ALL RIGHT.  THERE BEING NO OTHER

3   MATTERS TO COME BEFORE THE COURT WE WILL STAND IN RECESS

4   UNTIL ELEVEN A.M.

5        MR. PUIG:  THANK YOU, YOUR HONOR.

6                      -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                               C E R T I F I C A T E

4

5

6    UNITED STATES OF AMERICA

7    SOUTHERN DISTRICT OF FLORIDA

8

9

10         I, **CARL SCHANZLEH**, OFFICIAL COURT REPORTER OF THE

11   UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF

12   FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING 24 PAGES

13   CONSTITUTE A TRUE TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE

14   THE SAID COURT HELD IN THE CITY OF FORT LAUDERDALE, FLORIDA,

15   IN THE MATTER THEREIN STATED.

16         IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS

17   30TH DAY OF AUGUST, 2000.

18

19                        _____

20                        **CARL SCHANZLEH, RPR-CM**
                         OFFICIAL FEDERAL COURT REPORTER
                         299 EAST BROWARD BLVD., 202B
21                        FORT LAUDERDALE, FL  33301
                         TELEPHONE 954/769-5488

22

23

24

25