NIGHT BOX
FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA    NOV 1 5 2000

Case No. 00-6211-CR-HURLEY
CLERK, USDC / SDFL / WPB

UNITED STATES OF AMERICA    )
                            )
v.                          )
                            )
MOHAMMED SAMHAN             )
                            )
_____)

NOTICE OF FILING

The United States of America, by and through undersigned counsel, hereby gives notice of filing the attached transcript of the detention hearing on October 27, 2000, before Magistrate Judge Seltzer. This transcript is submitted in support of the Government's November 1, 2000, Appeal of Magistrate Judge Seltzer's Denial of the Government's Request for Pretrial Detention.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
LAURENCE M. BARDFELD
Assistant U.S. Attorney
500 East Broward Blvd., #700
Ft. Lauderdale, Florida 33394
(954) 356-7255, Fax: 356-7228
Fla. Bar No. 712450
E-Mail:Laurencebardfeld@justice.usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed/hand-delivered this ___15th___ day of November, 2000, to: Richard Hamar, Esquire, 2437 Briarcrest Road, Beverly Hills, CA 90210, and Leonard Fenn, Esquire, 2121 Ponce de Leon Boulevard, Suite 430, Coral Gables, FL 33134.

LAURENCE M. BARDFELD
ASSISTANT U.S. ATTORNEY

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

UNITED STATES OF AMERICA,

                        Case No. 00-6211-Cr-HURLEY

      Plaintiff,

vs.                       FORT LAUDERDALE, *FLORIDA*
                            OCTOBER 27, 2000

MOHAMMED SAMHAN, et al,

      Defendants.

---

### TRANSCRIPT OF PRETRIAL DETENTION HEARING
### BEFORE THE HONORABLE BARRY S. SELTZER,
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

                        LAURENCE BARDFELD, A.U.S.A.
                        500 East Broward Blvd., 7th Floor
                        Ft. Lauderdale, FL 33301 954/356-7255

FOR THE DEFENDANT:

                        HAMAR & HAMAR
                        2437 Briarcrest Road
                        Beverely Hills, California
                        BY:  RICHARD A. HAMAR, ESQ.

REPORTED BY:             JERALD M. MEYERS, RPR-CM
                        Official Federal Court Reporter
                        301 North Miami Avenue, 9th Floor
                        Miami, FL  33128-7797 - 305/374-8108

STENOGRAPHICALLY REPORTED COMPUTERIZED TRANSCRIPTION

1   (Call to order of the Court)

2          THE COURT:  Let me take a moment to welcome you

3   here to the courthouse, this being for our October 27, 2000

4   magistrate's court hearings.

5          Let me call the case of the United States versus

6   Mohammed Samhan.  Let me ask counsel to please state their

7   appearances.

8          MR. BARDFELD:  Good morning, Your Honor.  Larry

9   Bardfeld for the United States.

10         THE COURT:  Counsel.

11         MR. HAMAR:  If it please the Court, Richard Hamar

12   for Mohammed Samhan.  With me is Lawrence Finn, Your Honor.

13         THE COURT:  Welcome.  All right.  Welcome.  We

14   are here for purposes of another pretrial detention

15   hearing.  Are both sides ready to proceed?

16         MR. BARDFELD:  Yes, we are, Your Honor.

17         MR. HAMAR:  Yes, Your Honor.

18         THE COURT:  I read, by the way, the submission,

19   so there is no need to repeat what is in there.

20         More specifically, what I am referring to is the

21   defense motion for de novo review.  I have read through it,

22   so there is no need to review what is in there.

23         All right.  Let me turn to the government and to

24   Mr. Bardfeld to begin.

25         MR. BARDFELD:  Your Honor, I apologize.  I am

1  going to go through the same proffer that I made the last

2  time.  So you have heard it before.

3          I mean, there is really nothing new, but under

4  the circumstances of this case, we do have new defense

5  counsel on this case.  I don't know if they have heard the

6  proffer.

7          I think they have read the transcript, but for

8  purposes of completeness, I will go through it.

9          **THE COURT:**  All right.

10         **MR. BARDFELD:**  Your Honor, the defendant Mohammed

11  Samhan, a codefendant, Rabah El Hadad, and twelve

12  codefendants are charged, by way of indictment, with

13  conspiracy to possess and distribute Sudafedrin, a List One

14  chemical, as defined in Title 21, United States Code,

15  Section 802, knowing and having reasonable cause to believe

16  that the listed chemical, that is, Sudafedrin, would be

17  used to manufacture a controlled substance; that is,

18  Methamhetamine.

19         The defendant is also charged in two substantive

20  counts of possession and distribution of Sudafedrin.  This

21  is all in violation of Title 21, United States Code,

22  Section (d)(2) and Section 846, the conspiracy.

23         Beginning in September of 1999, the lead

24  defendant in this case, Thomas Narog, began receiving

25  extraordinarily large shipments of Sudafedrin from drug

1    manufacturers in New York.

2         Narog is the only employee of Seaside

3    Pharmaceutical, a recently formed pharmaceutical company in

4    South Florida.  The company has no office and exists only

5    in three separate storage units at a public storage

6    facility.

7         Narog is the only person involved in this

8    indictment who can legally obtain this Sudafedrin from the

9    manufacturers because he is the only DEA registrant amongst

10   the defendants.

11        Sudafedrin is an over the counter cold medicine

12   that is not illegal to possess or distribute.  However, it

13   is a precursor to Methamhetamine and is used to manufacture

14   Methamhetamine, usually in clandestine labs in the western

15   part of the United States.

16        In this particular instance, this defendant was

17   in possession, as were all the defendants, of massive

18   quantities of Sudafedrin pills.

19        On three separate occasions, Mr. El-Hadad and

20   codefendant Mohammed Samhan received shipments of

21   Sudafedrin from the lead defendant Thomas Narog.

22        The Sudafedrin was driven to Miami from the

23   storage facility in Broward County where El-Hadad and

24   Samhan re-packaged it and then re-shipped it and packaged

25   it and sent it to the West Coast.

1          The shipping packages were labeled as books or

2   shavers or shoes.   They were not labeled as Sudafedrin or

3   any kind of medicine.

4          Additionally, the boxes that were used said,

5   "True Choice Sudafedrin" on the boxes when they came from

6   the storage facility to the package facility.

7          On at least two occasions, codefendant El-Hadad

8   traveled to California or Oregon, wherever the Sudafedrin

9   was being shipped, to make certain that the particular

10  shipment of Sudafedrin made it to its intended destination,

11  because numerous shipments of the Sudafedrin were involved

12  in this conspiracy and were intercepted by law enforcement

13  officials on the West Coast.

14         When Mr. El-Hadad was arrested in California, he

15  was in possession of 220 pounds of nothing but loose

16  Sudafedrin pills.

17         When Mr. Samhan was arrested in this case in his

18  residence in Miami, almost 150 pounds of loose Sudafedrin

19  was found.

20         The government would rely on the rebuttable

21  presumption in this case and say that the defendants are a

22  risk of flight and danger to the community.

23         Just so the Court is aware, this is a base level

24  offense of 30.   Anything over 20 kilograms or 44 pounds of

25  Sudafedrin is at the top of the guidelines, which would be

1   a level 30 in this case.

2           THE COURT:  What is the range?

3           MR. BARDFELD:  97 to 121 months.  That's assuming

4   that there is no acceptance of responsibility and no

5   organizer or leader.

6           THE COURT:  Right.  I understand.

7           MR. BARDFELD:  As I said before, 144 pounds of

8   nothing but pure pills, and I think I showed you this last

9   time, the pills were like this, just in pill form, not in

10  bottles.  They had been taken out.

11          As I will go through my proffer, I will tell you

12  how they were taken out, but they were found, 144 pounds of

13  that were found in Mr. Samhan's residence.

14          Specifically, as to this case, between September

15  of '99 and June of 2000, Mr. Narog at Seaside

16  Pharmaceutical received approximately 36,000 gross pounds

17  of Sudafedrin.

18          Since the Sudafedrin was delivered Seaside

19  Pharmaceutical, which exists only as a storage warehouse,

20  agents had coordinated at least seven controlled deliveries

21  of Sudafedrin in California and Oregon and other places in

22  the West.

23          The Sudafedrin had been delivered to clandestine

24  labs where it was being used to manufacture Methamhetamine.

25          Specifically, three of Mr. Narog's shipments, and

1 just so the Court is aware, there are other defendants

2 charged in other indictments. I believe it is a 14 count

3 indictment.

4          So the three that I am referring to specifically

5 address Mr. Samhan and his codefendant, Mr. El-Hadad. I am

6 not going to go into the other shipments, but three of them

7 involved Mr. Samhan and Mr. El-Hadad.

8          The first load happened on June 1st of the year

9 2000, when agents observed Narog, Ghandi Jaber, Motlaq

10 Jaber and Raed-Naser-Aldin arrive at Seaside

11 Pharmaceuticals.

12          They observed Narog, Jaber, Jaber and Aldin move

13 boxes of Sudafedrin from one of the warehouses into a

14 second warehouse. A U-Haul truck was parked at a Dunkin

15 Donuts near the storage facility.

16          Mr. El-Hadad exited that Dunkin Donuts and got in

17 the U-Haul and drove to that particular storage facility.

18          Mr. Samhan was also in the Dunkin Donuts at that

19 time.

20          Shortly after Mr. El-Hadad left in the U-Haul,

21 Mr. Samhan left that same Dunkin Donuts and got into a Ford

22 Explorer. Samhan in that Ford Explorer drove around the

23 area, as if looking for surveillance. He parked his

24 vehicle near one of the surveillance vehicles and walked

25 around the area on foot.

1          He then got back in the Explorer and drove around

2    for another five minutes as if he were looking for

3    something.

4          When Mr. Samhan was doing counter-surveillance

5    and driving around the area, Mr. El-Hadad had gone to the

6    warehouse where he and Motlaq Jaber loaded 200 boxes of

7    Sudafedrin into the back of the U-Haul truck.

8          Mr. El-Hadad then left the warehouse in the

9    U-Haul truck filled with the boxes of Sudafedrin.

10          Mr. Samhan followed him in the U-Haul south

11    towards Miami where they met at a private postal facility

12    called Pac-Mail in Kendall.

13          At the Pac-Mail store, some of the boxes of

14    Sudafedrin were re-packaged into larger boxes for easier

15    shipment to the West Coast.  Samhan then placed 15 or 20 of

16    the larger boxes of Sudafedrin into the back of the

17    Explorer.

18          He left and went to a nearby shopping plaza.

19    Hadad left the Pac-Mail in the U-Haul and took 15 of the

20    those larger boxes that had been re-packaged to a Federal

21    Express office where a total of 495 gross pounds of

22    Sudafedrin was shipped from the Federal Express office.

23          The shipment was sent to Laselva, L-a-s-e-l-v-a

24    at Laselva, Inc. in Laselva Beach, California.  The sender

25    was listed as shavers, plus cosmetics.  This load of

1    Sudafedrin made it through to California.

2              Just so the Court is aware as to how much

3    Sudafedrin can be manufactured with 495 gross pounds, 10

4    percent of the gross pounds of Sudafedrin are converted to

5    pure Sudafedrin.  Then 70 percent of Sudafedrin is used to

6    manufacture Methamhetamine at a price of $6,000.00 for a

7    pound of Methamhetamine, which is what it is in California.

8              This particular load of close to 500 gross pounds

9    of Sudafedrin was worth approximately $210,000.00.

10             Again, so that the Court is aware, the value of

11   the pound of Sudafedrin in California is $6,000.00.

12             In South Florida, it is $16,000.00.  Now, we have

13   no evidence that it was coming back to South Florida, but

14   we don't know because all of the Sudafedrin was ultimately

15   seized out there, and we are just assuming, for purposes of

16   argument, the lesser value of $6,000.00 a pound, but it

17   could be, if they had brought it back, if they had brought

18   it back after it was manufactured out on the West Coast and

19   brought it back here, it would be worth 2 to 3 times what

20   they paid for it out there in California.

21             One of the reasons that that might be done is

22   because they don't have any clandestine Meth labs in South

23   Florida.  Most of it is out in California.

24             Okay.  In this particular case, Your Honor, since

25   that entire shipment that had been taken from Narog's

1    warehouse was not sent, agents re-established surveillance

2    at that Pac-Mail facility on the next day.

3            Agents ultimately observed the codefendant

4    El-Hadad drive the U-Haul back.  Packages were then shipped

5    again to Laselva, California.  He sent 22 more packages, a

6    total weight of 902 gross pounds.  The value of that load

7    would be $378,000.00.

8            Now, Mr. El-Hadad traveled to California to

9    facilitate the transfer of this Sudafedrin.  On June 7th,

10   he had flown to California to facilitate the transfer and

11   met with the confidential informant in San Jose,

12   California.

13           During this meeting with the codefendant,

14   El-Hadad set said he was looking for the raft in the

15   organization, referring to previous arrests and seizures of

16   Sudafedrin that had been made on the West Coast.

17           Now, I am not saying that Mr. Samhan had anything

18   to do with that, but Samhan and El-Hadad had traveled

19   together.  They had packaged things together, and they were

20   sending things out together.  So I assume Mr. Samhan stayed

21   here and Mr. El-Hadad went out to California to take care

22   of business.

23           That was the first load.  The total value of that

24   load, 495 gross pounds on one day which would be worth

25   210,000; 902 gross pounds the next day, which would be

1   378,00, for a total value of $588,000.00 for the first

2   particular load.

3           The second load was sent on June 15th of the year

4   2000, when Mr. El-Hadad and Samhan obtained a second load

5   from Narog at Seaside Pharmaceuticals.

6           The Sudafedrin was delivered by commercial

7   carrier to Pac-Mail where Mr. El-Hadad and Mr. Samhan then

8   met it.  At the Pac-Mail, Mr. El-Hadad and Mr. Samhan again

9   re-packaged the Sudafedrin into 27 larger cardboard boxes.

10          The 27 boxes were loaded into a Ryder Truck and

11  delivered to Target Logistics near Miami International

12  Airport.

13          Approximately 3 or 4 days later on June 19th, the

14  27 boxes were shipped to Salem, Oregon.  The boxes at that

15  time were labeled as shoes being shipped to Sal's Shoes in

16  Salem, Oregon.

17          A few days after that, Mr. El-Hadad again

18  traveled to the West Coast.  He arrived in Portland,

19  Oregon.  The Sudafedrin at that time was seized by law

20  enforcement officials in Oregon before it reached its

21  intended destination.

22          A total of 2,300 gross pounds of Sudafedrin was

23  seized.  The value of 2,300 gross pound of Sudafedrin is

24  approximately $966,000.00.

25          A third load was obtained by these defendants on

12

1    July 21st of the year 2000.  On that day, at Mr. Narog's

2    storage facility, the Sudafedrin was transported to

3    Pac-Mail again by commercial carrier.

4          Again, Mr. El-Hadad and Samhan arrived and

5    re-packaged the boxes into larger shipping boxes.  Those

6    boxes were then placed into Samhan's Explorer, and

7    Mr. El-Hadad's wife's van.

8          The agents attempted to do counter-surveillance

9    on these two individuals, but the drivers themselves were

10   doing a lot of counter-surveillance to see if anyone was

11   following them.

12         For example, as they were going to one of their

13   residences, instead of driving straight to the residence,

14   the drivers would drive around the block 3 or 4 different

15   times to make sure no one was following them when they went

16   to the particular residence.

17         A few days after this load, on July 21st of the

18   year 2000, part of that shipment was sent to California.

19         Again, Mr. El-Hadad arrived in California to make

20   certain that the Sudafedrin arrived safely.  Hadad was

21   arrested in California while attempting to assist in the

22   load.

23         Agents seized 220 pounds in five boxes of loose

24   Sudafedrin pills in baggies in California.  Agents estimate

25   that the 220 pounds of Sudafedrin can be converted into 198

13

```
 1   pounds of Methamhetamine, and the value of the loose pills
 2   that Mr. El-Hadad had on his person or in his possession in
 3   California was approximately $924,000.00.
 4        THE COURT:  220 pounds?
 5        MR. BARDFELD:  220 pounds of nothing but loose
 6   pills.  Again, it would be similar to these pills here.
 7        THE COURT:  Right.
 8        MR. BARDFELD:  At about the same time, Mr. Samhan
 9   was arrested in Miami.  He gave consent to search his
10   residence.  Inside the residence agents discovered two
11   boxes weighing approximately 62 pounds each with nothing
12   but loose Sudafedrin pills.
13        Agents also discovered another four boxes each
14   weighing approximately five pounds of nothing but loose
15   pills for a total of 144 pounds of nothing but loose pills
16   in his residence.
17        Agents again estimate that the value of this
18   would be approximately $600,000.00.
19        Agents then went and interviewed employees at
20   Pac-Mail which was where Mr. Samhan and Mr. El-Hadad had
21   shipped this Sudafedrin from.
22        One of the employees assisted in taking the pills
23   out of the bottles before the shipment.  That employee was
24   paid $200.00 on two separate occasions to take pills out of
25   the bottles and place them in plastic baggies.
```

1       The employee would take the pills out after work.

2  He indicated that Mr. El-Hadad had showed him how to take

3  the pills out of the bottle by sticking a fork through the

4  seal, removing the cotton and dumping the pills into the

5  baggie.  Mr. El-Hadad even commented that it so was easy

6  that his children had done it.

7       Law enforcement officials are aware of three

8  separate shipments of Sudafedrin by Mr. Samhan and

9  Mr. El-Hadad to the West Coast.

10      The total of Sudafedrin was approximately 590

11  pounds which would be shipped to the West Coast and then

12  another 150 pounds which were seized.

13      The estimate of the total value of the Sudafedrin

14  that was going to be manufactured into Methamhetamine out

15  in California was 3.1 million dollars.  That's assuming

16  $6,000.00 per pound value for Methamphetamine.

17      THE COURT:  590 pounds you are saying was shipped

18  and the value was 3.1 million?

19      MR. BARDFELD:  3.1 million.  And if we use the

20  number 16,000 per pound, there would be 8.9 million.

21      I would also rely on the Pretrial Services report

22  which indicate that while Mr. Samhan I believe is a legal

23  resident.  He is not yet a citizen.  He was born in Jordan,

24  and he has traveled to there on a few occasions in the

25  past.

1    That would be the extent of my proffer in this

2    case.

3    THE COURT:  All right.  Does the defense wish to

4    cross-examine the government's agent?

5    MR. HAMAR:  Yes.  On a limited basis.  Thank you,

6    Your Honor.

7    THE COURT:  All right.  Let me ask the agent to

8    approach and be sworn.

9    **JOSEPH COLLINS SWORN**.

10    THE COURT:  Please be seated.  Once you get

11    seated, would you, please, state your full name and spell

12    your last name.

13    THE WITNESS:  Joseph Collins, C-o-l-l-i-n-s.

14    THE COURT:  Counsel, you may cross-examine.

15    MR. HAMAR:  Thank you, Your Honor.  Agent

16    Collins, my name is Richard Hamar.  We met a little earlier

17    today.

18    **BY MR. HAMAR:**

19    Q.    Would you be considered a co-case agent?

20    A.    Yes.

21    Q.    All right.  And have you reviewed the reports to date?

22    A.    Yes.

23    Q.    Did you discuss the matter in these reports with other

24    agents?

25    A.    Yes.

16

1  Q.    Have you been at least briefly apprised of the actual

2  articles of Mohammed Samhan?

3  A.    Yes.

4  Q.    And based on the reports and conversations with other

5  agents, was he peaceful when he was arrested?

6  A.    Yes.

7  Q.    Was he cooperative when he was arrested?

8  A.    Yes.

9  Q.    And you have heard the proffer Mr. Bardfeld.  He

10 consented to a search of his home; is that correct?

11 A.    Yes, he did.

12 Q.    There were no weapons found when he was arrested?

13 A.    No.

14 Q.    He was under surveillance as we've heard from the

15 proffer?

16 A.    Yes.

17 Q.    And there were no weapons seen at any time while he was

18 under surveillance?

19 A.    Correct.

20 Q.    Have you looked in, as a co-case agent, have you looked

21 into his past, what we might call a rap sheet or history?

22 A.    Yes.

23 Q.    Isn't it true that he has no prior felony arrests?

24 A.    I don't recall.  I would have to take a look at the rap

25 sheet again, but off the top of my head, I am not familiar.

1  Q.    Okay.  And from your review of his history as you know

2  it, or with your familiarity, you can advise this Court of

3  no incidents of violence in his life, can't you?

4  A.    Again, I would have to look at the report again.  I've

5  seen it before, but I would have to look at it again.

6  Q.    Okay.  As we heard from the proffer, cold pills were

7  received in the Southern District of Florida?

8  A.    Yes.

9  Q.    And they were warehoused at Seaside by a person named

10 Narog?

11 A.    Narog.

12 Q.    Narog.  I am sorry.  He is the first name on the

13 indictment?

14 A.    I believe so.

15 Q.    And have you reviewed or had the opportunity to review

16 or spoken with agents, the leases or business agreements

17 related to the warehouse?

18 A.    Yes.

19 Q.    Is Mr. Samhan in any way on any lease or business

20 agreement related to the warehouse?

21 A.    No.

22 Q.    Does he appear on any document connecting him to the

23 warehouse?

24 A.    No.

25 Q.    Is there any evidence that he owns, leases or managers

1    this warehouse?

2    A.    No.

3    Q.    And I take it he was not seen at the warehouse at any

4    time during the surveillance?

5    A.    Not in the warehouse, but in the vicinity of the

6    warehouse.

7    Q.    All right.  The cold pills, as we heard from the

8    proffer, are shipped out of state?

9    A.    Yes.

10   Q.    And Methamhetamine can be produced from these pills?

11   A.    Yes, it is.

12   Q.    Okay.  And there are seven other ingredients that,

13   added up in a proper way, would make Methamhetamine,

14   correct?

15   A.    Correct.

16   Q.    And based on records, surveillance and reports,

17   Mr. Samhan has never left the Southern District of Florida

18   to travel to any location where these pills have been made

19   or could be made into Methamphetamine?

20   A.    Not that's been revealed in our investigation.

21   Q.    Okay.  And he, based on your reports and discussions

22   with the agents, has not related to anybody that he was

23   involved with people who received the shipments; am I

24   correct?

25   A.    Can you repeat that?

1    Q.    Yes.    There is no information that he has a connection

2    to any of the persons that have received the shipments, a

3    personal connection in the sense of being seen with them or

4    conversing with them or dealing with them?

5    A.    No.    You are correct.    We haven't seen him conversing,

6    no.

7    Q.    And he has not been reported discussing that he knew

8    that the pills could be made into Methamphetamine?

9    A.    Correct.

10   Q.    No informant that has agreed to testify has advised you

11   that Mr. Samhan knew the cold pills could be made into

12   Methamphetamine?

13   A.    Correct.

14   Q.    Mr. Samhan did not state to any agent that he knew the

15   cold pills would be used to make Methamphetamine?

16   A.    Correct.

17   Q.    There is no ledgers or pay notes that indicate that

18   Mr. Samhan was part of a conspiracy to possess a precursor

19   to make an illegal drug.    Am I correct?

20   A.    Ledgers of his own?

21   Q.    Any kind of ledger that mentions him as being a member

22   of a conspiracy?

23   A.    Not that I am aware of, no.

24   Q.    Okay.    And based on your surveillance and other

25   evidence, Mr. Samhan is mostly connected to Mr. El-Hadad in

20

1   this indictment; am I correct?

2   A.    Correct.

3   Q.    And in the parlance of law enforcement and prosecution,

4   we often talk in terms of cells as far as conspiracies?

5   A.    Correct.

6   Q.    And there are various cells involved in this indictment

7   is the way you would describe it?

8   A.    Yes.

9   Q.    And it would be most accurate to say that the cell that

10  Mr. Samhan allegedly belongs to would be that which is

11  connected with Mr. El-Hadad?

12  A.    Yes.

13  Q.    And those are the two bottom people on the indictment

14  if we looked at the indictment; am I correct?

15  A.    What do you mean by bottom?

16  Q.    Just in list of order.

17  A.    Of importance?

18  Q.    El-Hadad was on top and Jaber?

19  A.    No, I wouldn't say of importance.

20  Q.    I am just saying the way it is listed.

21  A.    On paper?

22  Q.    I am not asking for any conclusion.  Is that correct?

23  A.    But on paper?

24  Q.    Yes, on paper.

25  A.    I would have to look at how it is written down on

1    paper.  I don't remember how it is typed up.

2    Q.    Okay.

3            MR. HAMAR:  May I confer with Leonard, Your

4    Honor?

5    BY MR. HAMAR:

6    Q.    Have you done a financial investigation of Mr. Samhan?

7    A.    Not an in-depth financial investigation.

8    Q.    But you've done at least a cursory investigation?

9    A.    I believe we have.

10   Q.    Is there any indication, as co-case agent, that he has

11   had an increase in his bank accounts or any other properties

12   since the beginning of this investigation?

13   A.    No.

14   Q.    Is there evidence whatsoever that he has benefited to

15   even five cents as a result of this investigation?

16   A.    Not that we have seen.

17   Q.    And have you identified the type of business that

18   Mr. Samhan has?

19   A.    I don't think we've totally identified what he does for

20   a living.

21   Q.    Do you have any idea of any storage or properties that

22   he owns?

23   A.    Not off the top of my head, no.

24   Q.    Would it refresh your recollection if I mentioned a

25   food store type of business as far as him being a

1  proprietor?

2  A.    I believe I understood he worked at one.  I am not sure

3  if he owned one.

4  Q.    So you couldn't by helpful to the Court in that regard?

5  A.    No.

6        MR. HAMAR:  Your Honor, I have no further

7  questions.

8        THE COURT:  Any redirect?

9        MR. BARDFELD:  No, Your Honor.

10       THE COURT:  Thank you agent.

11              [The witness was excused].

12       THE COURT:  Does the government rest?

13       MR. BARDFELD:  Yes, Your Honor, but I would ask

14  if I may, when the defendants were arrested, Mr. Samhan,

15  Mr. Jaber and Mr. Narog were all brought to the DEA for

16  processing.  When they approached each other, one of the

17  agents --

18       THE COURT:  Can you get closer to the mike.  We

19  need to get this on audio.

20       MR. BARDFELD:  I am sorry.  When the agents were

21  in there, they said, "Mr. Samhan, do you know Mr. Narog?

22       Mr. Narog, do you know Mr. Samhan?  Do you know

23  Mr. Jaber?"  All of that.  They all claimed that they

24  didn't know each other.

25              They said that they have never seen each other,

1    and things along those lines, for what it is worth.

2          MR. HAMAR:  And I would have no questions

3    regarding the supplemental proffer by the government.

4          Your Honor, may the defense be permitted to make

5    a proffer?

6          THE COURT:  Does the government rest?

7          MR. BARDFELD:  Yes, Your Honor.

8          THE COURT:  Let's go over to the defense.

9          First, with respect to the Pretrial Services

10   report, are there any errors or inaccuracies in the report

11   that you wish to note?

12         MR. HAMAR:  None.

13         THE COURT:  Okay.

14         MR. BARDFELD:  Your Honor, would it be

15   permissible just to get a sip of water?  My mouth is

16   suddenly dry.

17         THE COURT:  Certainly.

18         MR. BARDFELD:  May I go outside the courtroom?

19         THE COURT:  No.  We will get it for you.

20         MR. BARDFELD:  Thank you.  We will just wait a

21   minute.

22         THE COURT:  All right.

23         MR. BARDFELD:  Thank you.

24         MR. HAMAR:  Thank you, Your Honor.  May I

25   continue?

1          THE COURT:  Yes.  Does the defense have a proffer

2   they would like to make?

3          MR. HAMAR:  Yes, we do.  Your Honor, we do.  I

4   thank the Court for reading our extensive document motion

5   for de novo review, so I won't bore the Court or repeat

6   what is in there, but for the record, we would like to

7   proffer on pages 3 and 4 the immigration status, travel,

8   family and community ties, steady employment, community

9   service and allegations of flight risk and, also, for the

10  record, we would like to proffer on page 12, factors 8, 9,

11  10, 11 and 12.

12         The other factors have been incorporated into the

13  first proffer, and we would respectfully request that if a

14  record need be produced, or a transcript need be produced,

15  that those matters could go in as a defense proffer.

16         THE COURT:  All right.

17         MR. HAMAR:  We also, Your Honor, would like to

18  respectfully proffer the letters which are attached to that

19  motion which are 1 through 18.

20         I would like to note that one of the letters has

21  been, or at least it is the first person, which is Thomas

22  Samhan, one handwritten and one typewritten, but there

23  would be 17 different people that have written letters of

24  support, and I assume Your Honor has read those letters?

25         THE COURT:  Well, I will be candid, with you.  I

1    read a representative sampling of them.   Some of them were

2    written in hand as opposed to being typed.

3          MR. HAMAR:   Thank you for your candid response.

4    I am sorry, Your Honor.

5          THE COURT:   I think the tone and the message of

6    them seems to be consistent, but I cannot say that I have

7    read all 17 of them, but I did read a representative

8    sampling, and I think they are all similar, and I take that

9    as so.

10          MR. HAMAR:   The only comment that I might make,

11   Your Honor, is the cross section I think is interesting.

12          We have the court clerk.   We have people that

13   profess to be Jewish from Israel, Catholic, Moslem.   It

14   really goes across the board as far as members in the

15   community.

16          Mr. Samhan, and I think most of these letters, if

17   not all, characterize him as a very fine man.   This comes

18   not only from his very limited, either relatives or close

19   family people, but really a great cross section of the

20   community.

21          THE COURT:   No, I did see that.   In fact, I was

22   particularly taken by the one written by an INS officer.

23          MR. HAMAR:   Right.   I would like to get to that

24   later, since that came in by supplement this morning, and I

25   didn't know if Your Honor had time to read it.

1          Mr. Bardfeld had this letter that I faxed I think
2    three days ago, if I am not mistaken.
3          I would also at this time want Your Honor to note
4    and recognize and also have our record, of course,
5    acknowledge the amount of people that we have in the
6    courtroom, with the exception of the illustrious Mr. May
7    who is not part of the group, per se.
8          We have family members.  We have friends and we
9    have esteemed members of the community, and in this group
10   of people which I have just done a head count, there is
11   about 25.
12         There was a request by the family to bring in
13   200, and I said, "No, that would be a little bit extreme.
14   I do not think we have the room in the courtroom."
15         They said, "How about 50?"  And I said, "I think
16   if you just bring in about 25 members that are either
17   family, close friends, and especially those people that
18   would like to tend a proffer, then the government and the
19   court would get the message that there are people in the
20   community that are supporting your bond application."
21         The members in the audience, Your Honor, include
22   family.  The mo is here in the courtroom.  She was not here
23   at the first hearing on August 3rd.
24         The only person of immediate family left in the
25   West Bank, or that part of the world, is one brother who is

1   in Saudi Arabia Rabin.  With the exception of that brother,

2   every immediate family member is present in the United

3   States, the majority of which are in South Florida.

4           We have some relatives that, for example, are in

5   Detroit.

6           The wife of Mohammed Samhan is present in the

7   courtroom.  Naturally, I instructed them not to bring the

8   U.S. citizen children, but there are two U.S. citizen

9   children who are two and four.

10          We have at least six persons in the courtroom

11  that are willing to put up their homes, and substantially

12  all of the property that they have in the world as absolute

13  guarantees, and this does not include immediate family

14  members.

15          These would be persons outside of the immediate

16  family that are so certain that Mr. Samhan would not flee,

17  that they would pledge virtually everything that they own.

18          If Your honor or the government has any questions

19  of the people in the audience or questions of myself about

20  the people in the audience, I would tender those people to

21  Your Honor or to the government.  Otherwise, I will move

22  on.

23          THE COURT:  Well, I would like to hear proposals

24  specifically.  What bond you are proposing as an

25  alternative; who the co-signators on your proposed bond

1    are, and what the form of the bond would be; what assets

2    these proposed co-signators have.

3         **MR. HAMAR:**  Right.  Your Honor, I would suggest a

4    bond, because we are really talking about a combination of

5    conditions that would be extremely stringent, I would

6    propose, number 1, that we absolutely have a corporate

7    surety bond of at least $100,00.00 because that would

8    provide the Court with a responsible professional who

9    would, in his own way, monitor the defendant and have to

10   accept property, at least $100,00.00 in value.

11        In addition to that $100,00.00, or a figure that

12   the Court feels is appropriate, and we would like to hear

13   from the government if Your Honor finds that we overcome

14   the rebuttal presumption, and the government has not proven

15   by clear and convincing evidence that there is flight, we

16   would just suggest that because of the bond, everybody in

17   this case, we presented a chart to the government, and Your

18   Honor has gotten bond, with the exception of what we might

19   call the two kingpins in this particular indictment.

20        The bonds have remained from 50,000 to 75,000 and

21   then to 100, and then a little more but, Your Honor, we

22   feel there is so much support in the community, that we are

23   willing to do more.

24        We would propose that Mr. Barakat, who is a

25   businessman in the community, would pledge his home which

1   is valued at hundreds of thousands of dollars.  There is

2   other members in the community that are not immediate

3   family that would pledge homes.

4        I looked at the value of these homes.  They

5   typically have a market value of 150,000.  When you

6   subtract, the mortgages, they may have equity of between 30

7   and 75,000.

8        I understand this is not a great sum of money,

9   but to somebody that's labored most of their life, their

10  home is, of course, their major asset.  They are willing to

11  put all of that on the line.

12       I would suggest, Your Honor, that after

13  appraisals, after Nebbias, I can say that we would be able

14  to come up with at least $400,000.00 worth of real estate

15  by members in this community who are legitimate through a

16  Nebbia and have combined equity of about $400,000.00.

17       We would also like to suggest to Your Honor that

18  electronic monitoring be imposed and, in essence, house

19  arrest.  This is the same condition Mr. El-Hadad has.

20       Mr. El-Hadad, really as far as the weight of the

21  evidence and culpability even though I would assume them to

22  be in the lowest cell is much greater in culpability, and

23  there is much greater evidence, he has electronic

24  monitoring.

25       We would submit to the Court my experience with

1  electronic monitoring is not only does the bracelet deter

2  the defendant from violating bond conditions, but the

3  professionals that monitor are so much more vigilant, that

4  virtually we get calls almost daily, and we have cases in

5  different districts, from those in that unit, as opposed to

6  the ordinary ordinary fine and Pretrial Services officers

7  where you get the visit three times a week.

8          I mean, they are really vigilant.  They are watch

9  dogs, and that electronic monitoring I think is just

10  wonderful, not only a deterrent, which I don't think we

11  need in this case, but it is, and it is just a great

12  device, and we would tender that that should be imposed,

13  also.

14          So we are really, and then again looking at the

15  case law, we are requesting the Court to impose the most

16  stringent conditions possible, and far in excess of any

17  bond in this case.  I mean, almost I would say four to five

18  times the amount of any bond.

19          We've given Your Honor the chart, and we want to

20  do, in all sincerity, totally sincere, and do everything we

21  can to assure the government and the Court that you would

22  be making the right decision if bond were granted.

23          I have a few other points I would like to bring

24  up to complete the record, if I could, Your Honor.

25          I would like to make brief mention of the letter

1    that Your Honor has received this morning.  I think it is

2    the most extraordinary letter for sure and perhaps piece of

3    evidence presented.

4            This is from a present Immigration &

5    Naturalization officer.  And when we read the letter he is

6    really saying four things.

7            He is saying, number 1, he was the officer that

8    adjudicated, in a sense, the political asylum claim of

9    Mr. Samhan, and he states that the claim was unique, and

10   the sincerity of the claim and the views and the

11   conscientiousness the views held were unique to him, and he

12   was also impressed by the moderation of the views.

13           They became personal friends, which I think is

14   extraordinary; one year later an immigration official

15   becoming a personal friends, having that much respect and

16   caring for somebody that comes in in refugee status with

17   Mr. Samhan, and then in the course of that friendship, he

18   recognizes that Mr. Samhan has done community service, but

19   not just your normal average.

20           We supplied three other examples of Save The

21   Children, other example of community service, but the type

22   of community service that's really gut wrenching and heart

23   warming.

24           This is a group that is not from his nation; that

25   is not from his religion, but to the Catholic Church for a

1    group of Iraqi refugees who had asylum claims coming from

2    the most vicious dictatorship in the world, not only

3    putting in money, and he is not a wealthy man.

4            As we can see by his home, he has a convenience

5    store and a home, but putting in money and resources to

6    help this group that he is not related to, and we have

7    evidence from an immigration official who is so moved by

8    that act as to really put himself on the line before the

9    federal court.

10           It is almost -- and I don't want to go too far --

11   Mr. Richard Calb, an immigration official, is not acting on

12   behalf of the federal government.  He is not acting on

13   behalf of Immigration &  Naturalization.  That's perfectly

14   clear, but he is an official of the federal government and

15   Immigration.

16           Finally, in that letter he is so confidant that

17   Mr. Samhan, putting his reputation on the line as an

18   immigration person, would not flee from his character, from

19   personal knowledge, and because of a well-founded fear

20   based on the political asylum claim.

21           Now, one might ask, with such a well-founded

22   fear, why did he go back to Jordan on the occasions that

23   Mr. Bardfeld referred to?

24           He went back for reasons that were greatly

25   personal to his family, including reasons to see his mother

1  who was sick at the time.

2          She is now in the United States, and knowing that

3  he had those fears, he did go back, but there are no

4  reasons or incentives to go back.

5          The other thing that Mr. Calb points out, and it

6  was a factor that, and I know that this is de novo, but

7  Your Honor haJ heard this case before in a limited fashion,

8  the other thing that was not known to you, Your Honor, of

9  course, was this terrible war that we are now having in the

10 Middle East, and when you look at Mr. Samhan who has two

11 U.S. citizen children, it would really defy belief that he

12 would be so fearful of conviction in this particular case

13 that he would remove his U.S. citizen children and take

14 them to a region where children are routinely endangered

15 and some are slaughtered because of this absurd war that's

16 going on over there.

17         So because of all of those reasons, and I think

18 it is self-evident that that would be the case, Mr. Samhan,

19 with his expired passport, posses, I believe, no risk, zero

20 risk of flight and, of course, the law doesn't require us

21 to guarantee that; just a reasonable assurance.  I think

22 that we've carried the burden on that.

23         I think the other thing that Your Honor should

24 know that was not known to you Your Honor was that he has

25 been in pretrial detention for 90 days; that we all know

1    Judge Hurley's schedule, and he we mentioned to Judge

2    Hurley, Mr. Leonard Fenn mentioned to Judge Hurley that

3    because our client was in detention, we could not agree to

4    a far off trial date, and Judge Hurley said, "I understand

5    that, but I am sorry.  The earliest trial setting we can

6    give you would be in the spring."

7             So Mr. Samhan would be in detention for an

8    additional five months if that trial date would even hold,

9    based on all the various schedules of the litigants.

10            So we are talking about an excessive period of

11   time to be in detention, and the statute and the case law

12   specifically mentions that as a factor which was not

13   considered by Your Honor in the first go around.

14            I would like just one second to look at my notes,

15   and I think that would conclude our presentation, Your

16   Honor.

17            THE COURT:  All right.

18            MR. HAMAR:  Thank you, Your Honor.  Mr. Fenn has

19   kindly pointed out there are no other assets in any other

20   place but South Florida.

21            We strongly feel that the incentive to remain is

22   that because he is just a few weeks away from scheduling

23   his citizenship, that because District Courts are to longer

24   accorded the right to recommend against deportation, his

25   sole incentive is to stay and be acquitted, and his entire

1   family is here.

2            So we feel again Your Honor has hit the nail on

3   the head.  It comes down to the combination of conditions

4   that would give reasonable assurance that Mr. Samhan would

5   stay here, and we have imposed very stringent ones.

6            If the government or the Court has others that

7   you would like to consider, or if you would like to recess

8   for five minutes or for me to speak with Mr. Bardfeld to

9   suggest others to the Court, I am happy to do so, in the

10  interests of judicial efficiency.

11           With that, I would submit the matter, unless you

12  have questions.

13           THE COURT:  No, I don't.  Mr. Bardfeld, any

14  response?

15           MR. BARDFELD:  Yes, Your Honor.  I want to

16  address two things.

17           First, the bonds of the codefendants, I think you

18  have to look at each individual defendant independently.

19           The fact is that magistrate judges in different

20  districts made mistakes, in my opinion.  We asked for

21  detention as to everyone of these defendants.  We did not

22  get it.  I think they made a mistake, to be quite honest

23  with you.

24           When some of them came from a different district,

25  like the Almasris, they came from Lakeland, Florida, or

 1   actually I guess it was Tampa and came down here and had

 2   their initial appearance after voluntarily surrendering, I

 3   didn't feel comfortable asking for detention at that point

 4   when we revisited the issue, but the magistrate judge in

 5   Tampa saw fit to give them a bond.  We asked for detention.

 6   We think the judge made a mistake.

 7           As to Mr. El-Hadad, the codefendant who is

 8   similarly situated, for lack of a better word, because they

 9   were both involved in the same particular loads,

10   Mr. El-Hadad was detained in San Jose, California.

11           There was a full-fledged detention hearing.  The

12   magistrate judge there detained him.  When he had his

13   initial appearance here, I told Judge Turnoff I didn't

14   think he was entitled to another hearing.

15           He said, "It is my understanding he is supposed

16   to appeal the decision."  Judge Turnoff said I was wrong.

17   I disagree with him, and I continue to disagree with him to

18   this day, and he saw to it that we had another hearing.

19           We went in front of Judge Bandstra for that

20   hearing.  At that hearing, I again argued to Judge Bandstra

21   I didn't think we should have the hearing.

22           He understood that, but he said," Look, since

23   everyone is here, we can have the hearing.  Then you can

24   argue with Judge Hurley if you should have had that."

25   That's fine.

1          THE COURT:  Yes.  I think the reason, and you may

2    be right, that procedurally the way to go is to take an

3    appeal to the district judge.

4          I think there are sometimes, on the parts of some

5    magistrates, legitimately a concern that perhaps in any

6    other district they were not given the type of in-depth

7    hearing that we allow people here, and that's sometimes I

8    think why that is done.

9          MR. BARDFELD:  I agree with you, Your Honor, but

10   in that particular instance, Judge Bandstra decided to give

11   a bond to Mr. El-Hadad.

12         THE COURT:  Right.

13         MR. BARDFELD:  The government at that point could

14   have appealed the bond, and we have appealed it.  We just

15   didn't stay the appeal.

16         Just so the Court is aware, the defendant

17   Mr. El-Hadad's two year old daughter had died the day

18   before his detention hearing.  I thought in order to be a

19   reasonable human being, I could let him out and do whatever

20   it was, instead of staying it so he was going to be in

21   while we appealed it.

22         THE COURT:  Right.

23         MR. BARDFELD:  That is on appeal.  Judge Hurley

24   plans on deciding that in the next few days.  It is my

25   understanding he was out of the town the entire month of

1  September, so he did not rule on it.  So I just want to

2  compare and contrast the bond there.

3       THE COURT:  Right.

4       MR. BARDFELD:  The other thing is when you look

5  at Mr. Calb, I think the judge is somewhat impressed with

6  an INS employee writing a letter, and to be quite honest, I

7  am very surprised that someone would do that, but he says,

8  if you look at the letter, he is a respected member of the

9  community and he loves his country.

10       Well, Judge, he cannot believe he would do

11  something like this.  Well, Judge, a grand jury of 23

12  people believed and had reasonable cause to believe that he

13  committed this crime against the United States of America.

14       I don't mean to make myself into and wave the

15  American flag, but that is what we have here; a man who is

16  not a citizen; who is in possession of 144 pounds of

17  nothing but pills, and Mr. Hamar says they are cold pills,

18  certainly, but if they were being used to stop colds in the

19  entire United States of America, they would still be in

20  bottle form.  They would still be in there.  This is the

21  quickest and easiest way to ship it out to the West Coast

22  so they can manufacturer it into Methamphetamine.

23       THE COURT:  I understand that.

24       MR. BARDFELD:  I would simply rely on the fact

25  that he has a Jordanian citizen.  He has traveled to

1   Jordan, and I understand that he has personal reasons to go

2   back there on certain instances, and that's why he may have

3   traveled back their in the past.

4           I am not going to hold that against him.  I would

5   just say that he has gone back there on occasion, and I

6   recognize this is a very impressive display of family and

7   friends who are here.

8           Nevertheless, we are talking about at least $3

9   million worth of Sudafedrin to be manufactured into

10  Methamphetamine that this man had on his person -- I am

11  sorry -- that this man was responsible for shipping, along

12  with the codefendant.

13          The total amount in this case is close to fifteen

14  million dollars worth of Sudafedrin.

15          The last thing I would say is I believe Mr. Hamar

16  was trying to indicate that Mr. Samhan is the last man on

17  the indictment.  Therefore, he is the least culpable.

18  That's not what happened in this case.

19          I think what we ended up doing is we ended up

20  doing it chronologically, and time-wise his incident was

21  the last incident in the case.

22          So the fact that he has on the bottom of the list

23  of defendants should mean nothing to the Court.

24          I would just again rely on the rebuttal

25  presumption of the fact that he is from Jordan, and the

1    fact that he had nothing but 144 pounds of loose Sudafedrin

2    which was on his person and in his house at the time of his

3    arrest.    Thank you, Your Honor.

4              MR. HAMAR:    May I have a brief response?

5              THE COURT:    Okay.    Just briefly.

6              MR. HAMAR:    I have come to respect Mr. Bardfeld

7    very much.    He is a very fair and judicious person in his

8    own right.

9              I would like to comment, however, that although

10   Mr. Bardfeld feels that mistakes were made in granting

11   these eight bonds, that can we really say that all eight

12   magistrates were wrong?

13             Secondly, if mistakes were made, why have all

14   eight of these defendants honored their bond conditions?

15   They are here.    They are going to Pretrial Services.    Each

16   and everyone of them has scrupulously honored their bond

17   conditions as far as I know, and it has not come to the

18   attention that to Mr. Bardfeld or the government that any

19   of the so-called mistakes that he thinks have been made are

20   true mistakes.

21             Secondly, or thirdly, although we can always

22   throw about great numbers as far as what drugs cost and

23   what they sell for, et cetera, when we look at this case,

24   it is a level 30 case.

25             I mean, I would think that most of your average

1   cocaine cases go way beyond 97 to 120 months, and yet can

2   we say that every defendant that has that type of level in

3   the guidelines should be detained?

4          This is not a situation where somebody is facing

5   25, 30, 40 years for 50, 60, 70, 80 kilos of cocaine or has

6   a level 38 to even begin with.

7          Your Honor asked the question during

8   Mr. Bardfeld's presentation, when we are talking about that

9   particular level, that doesn't even begin to account for

10  remorse or any other things that the defendant or a minimal

11  role could avail himself to.

12         So we can throw around a lot of pills.  We can

13  bring them into court.  We can talk about great quantities

14  and numbers, but when they really translate to the U.S.

15  Federal Sentencing Guidelines, they are not as great as the

16  average case of cocaine that comes walking in here, or even

17  a smaller quantity of heroin.

18         The other thing is the case law is very clear

19  about two things; that we don't detain people because of

20  the weight of drugs, and the second thing is that we don't

21  rely on just the rebuttable presumption, because the cases

22  are so clear, starting with Domingis and Carbony and

23  numerous other cases that Your Honor is more aware of than

24  I am, that when we bring in these type of people in this

25  courtroom, when we tender this type of property, when we

1  tender this type of combination of conditions, we have met

2  our burden of persuasion, and clearly we have in this case.

3          Once we've met our burden of persuasion, then the

4  government always, unless we don't meet the burden of

5  persuasion, always has the ultimate burden on flight of

6  preponderance but in most cases it is not like a simple

7  civil case, and certainly on dangerousness, by clear and

8  convincing, there is no evidence of dangerousness in this

9  case; I mean none in any theory or fashion.

10          So that would be my brief response to

11  Mr. Bardfeld.  Thank you, Your Honor.

12          **THE COURT:**  Okay.  Thank you.  Let me thank the

13  attorneys, Mr. Hamar and Mr. Finn on behalf of Mr. Samhan

14  and Mr. Bardfeld on behalf of the government for presenting

15  their arguments well on behalf of their respective clients.

16          I recall well when this matter was initially

17  litigated.  I remember thinking it was an arguably matter

18  from both perspectives.  Certainly, if I were the

19  government attorney, I would be making the request, and if

20  I were the defense attorney, I would be vigorously

21  defending it.

22          I thought it was a close matter, but I did not

23  think at the time that the defense had made a particularly

24  strong showing, and I ruled in favor of the government, but

25  I recall thinking at the time that there was a good chance

1  that there could be a motion for reconsideration filed, and

2  sure enough, there was, with defense counsel now coming

3  back with a stronger showing.

4          I've got to tell you that there are certain

5  things that do not enter into this, and let me make it

6  plain for the record.

7          What other judges did with respect to other

8  defendants is not a factor.  Each person is unique.  Each

9  person presents their own circumstances, and although I

10  respect the argument, and perhaps I would make the same

11  argument, I've got to tell you in this case that's not a

12  factor.

13          However, what I do believe is a factor are some

14  changed circumstances with regard to Mr. Samhan's relatives

15  out of the country, and more specifically a very concrete

16  proposal that's being made, and I think a reasonable

17  alternative that's being proposed by the defendant.

18          What I am going to do is vacate my previous

19  pretrial detention order, but I will give the government,

20  if they wish when I am done, an opportunity for me to stay

21  my decision if they wish to appeal it.

22          What I will do is adopt the proposal that

23  Mr. Hamar has put forward of a $100,000.00 corporate surety

24  bond, with a non-relative as the bondsman.  I think there

25  is something in your submission that a relative of his was

1  going to write the bond.  I think that would defeat, in

2  part, the purpose of having perhaps a neutral and

3  objective, and a $400,000.00 personal surety bond, and I

4  would like for you to get with Mr. Bardfeld and come up

5  with a list of the individuals and a showing of the equity

6  that they have in the property.

7       I want house arrest, 24 hours and electronic

8  monitoring, and at Mr. Samhan's expense.

9       In addition, at such time as Mr. Samhan is able

10  to come up with those properties and co-signatures, I will

11  set the other standard and special conditions of bond.

12       Also, on the corporate surety there will be a

13  Nebbia requirement as well, but let me, for purposes of the

14  record, go through, for purposes of an appellate record, go

15  through the factors that I have considered under Title 18,

16  United States Code, Section 3142(g).

17       First, number 1, the nature and circumstances of

18  the offense charged, including whether the offense is a

19  crime of violence or involves a narcotic drug.  Obviously,

20  this does not involve a narcotic drug.

21       The second is the weight of the evidence against

22  the person, and I have to judge that at this point in time.

23  I don't know what subsequent investigation will develop on

24  behalf of the government; perhaps in a way of cooperation,

25  or whatever, nor do I know what impeaching evidence the

1  defense will develop, and so I voice absolutely no outcome

2  as to the ultimate or no opinion as to the ultimate outcome

3  of this matter.

4         However, at this point it does appear that the

5  government has a significant case, although it is a

6  defensible case from the point of the defense.  I think

7  Mr. Hamar pointed up in his cross-examination basically

8  essentially the circumstantial nature of the case, but time

9  will tell how that will all shake out.

10         The third factor here, and perhaps the most

11  significant are the history and the characteristics of the

12  person, including family ties, employment, financial

13  resources, residence in the community, community ties and

14  criminal history.

15         The pretrial Services report speaks to most of

16  this, with the changes that Mr. Hamar noted.  There is no

17  prior criminal record which is significant in any narcotics

18  case.

19         Although the quantity of narcotics, as the

20  government properly points out, is quite large, and the

21  quantity found in Mr. Samhan's home was similarly large, he

22  is not somebody who is let's say a career narcotics

23  trafficker as we sometimes see.

24         Also, his supplier is essentially out of

25  business.  He has been pretrial detained.

1          Mr. Samhan's role was that of essentially a

2     packager and a shipper.  It is a fairly limited and defined

3     role in the overall conspiracy.

4          So, therefore, he is not the sort of individual

5     that would be able to pick up on his own, most likely, and

6     re-engage in this activity.

7          Again, I note that government properly argued

8     there is a substantial quantity involved, and what I have

9     said does not in any way diminish that.

10         Family ties, I think we have discussed that.

11    Mr. Samhan is a foreign national.  He was I guess about to

12    apply for U.S. citizenship.

13         He has some family members outside this district,

14    some outside the country, but on the other hand, he does

15    have a substantial number of family members and friends

16    within the community.  He does own property, and he does

17    own a business in the community as well.

18         I will set a $100,000.00 corporate surety bond

19    and a $400,000.00 personal surety bond, and I would like

20    for you to get with Mr. Bardfeld and come up with a list of

21    the individuals and a showing of the equity that they have

22    in the property.

23         3-B, whether he was on probation or pretrial

24    release, obviously, that's not applicable because he has no

25    prior criminal record.

```
 1              Number 4 is the nature and seriousness of the

 2    danger that the person would pose by the person's release.

 3    Again, the government properly notes that there is a

 4    substantial quantity of narcotics involved here, and that

 5    should not be diminished at all.

 6              However, I believe that by fashioning a bond,

 7    with the recommended house arrest and electronic

 8    monitoring, that that would insure that Mr. Samhan not

 9    again re-engage in trafficking of narcotics pending trial

10    in this matter.

11              Let me ask if the government wishes for me to

12    stay my decision to give you an opportunity to appeal?

13         MR. BARDFELD:  Yes, Your Honor.

14         THE COURT:  I will go ahead and we will do that.

15    What we will do is this:  I will stay it until the District

16    Judge has ruled on it, but assuming, for the sake of

17    argument, that Judge Hurley affirms my decision, what I

18    will do at that time then is let's schedule a hearing then

19    to actually set the standard and special conditions of bond

20    and get a list of the co-signators at that time, with

21    equity of $400,000.00, and to have the Nebbia showing.

22              So, Mr. Hamar, you don't want to go ahead and

23    incur the premium at this time.

24         MR. HAMAR:  Yes, Your Honor.

25         THE COURT:  A corporate bond.  Let's go ahead and
```

1    wait and see what Judge Hurley does with the appeal.

2            All right.  Let me ask whether either the

3    government or the defense has any other matters pertaining

4    to Mr. Samhan that they wish to raise?

5            MR. BARDFELD:  Not from the government, Your

6    Honor.

7            MR. FINN:  Judge, I don't know if this is

8    appropriate, but is it possible to considering limiting,

9    putting some kind of limit on the stay?

10           THE COURT:  No.  I would like Judge Hurley to, we

11   are essentially freezing the status quo.  Judge Hurley, I

12   don't want to in any way be seen as though influencing the

13   timing of his ruling.

14           I am sure he will get to it when he is able to,

15   but I appreciate it, the reason for you making that

16   request.

17           MR. FINN:  I am sorry to interrupt.  Perhaps you

18   would consider some time limit based on the government's

19   filing?

20           THE COURT:  Well, I assume that they will go

21   ahead and file their appeal today or tomorrow or the next

22   day.

23           MR. FINN:  That will be the notice, Judge.  If

24   there is no time limit, not that Mr. Bardfeld would do this

25   because he has been more than fair, but just for our

1    purposes.

2            THE COURT:  No.  You can appeal that to Judge

3    Hurley but, no, I am not willing to put a time limit on the

4    stay.  When Judge Hurley rules on it, he will get to it.

5            MR. FINN:  Judge, I am sorry.  One more point.

6    With regard to the Court's so far imposed conditions, you

7    said 24 hours house arrest.  Does that mean he is unable to

8    go to work?

9            THE COURT:  Yes.  It will be 24 hours.  I will

10   permit him, obviously, to make his court appearances, but,

11   yes.

12           MR. FINN:  He cannot go to work then?

13           THE COURT:  The whole idea, Mr. Finn, is that I

14   don't want him to be in a position where he is not

15   essentially being continually monitored, and he has the

16   opportunity to engage in this type of activity.  So that's

17   correct.  It will be 24 hours house arrest.

18           I've got to tell you the alternative I was

19   considering was a Dismis House placement, but I think this

20   is perhaps less restrictive.  He will be more comfortable.

21   I think we can accomplish the same purposes.

22           All right.  Any other questions that any of the

23   attorneys have?

24           MR. BARDFELD:  No, Your Honor.

25           MR. HAMAR:  No, Your Honor.  We would thank you