UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | NO. 00-6211-CR-HURLEY/VITUNAC |
| Plaintiff,      ) | |
| v.      ) | |
| MOHAMMED SAMHAN      ) | |
| Defendant.      ) | |

**POSITION OF DEFENDANT SAMHAN WITH RESPECT TO SENTENCING FACTORS; ISSUES IN DISPUTE AND OBJECTIONS TO PRESENTENCE INVESTIGATION**

COMES NOW, the Defendant, Mohammad Samhan, and respectfully files his timely Position with respect to sentencing factors; issues in dispute and objections to presentence investigation:

I. **OBJECTION TO OBSTRUCTION OF JUSTICE, P. 13, PAR. 52 AND P. 14, PAR. 59.**

A. THE LAW

The enhancement for testifying falsely at trial has passed constitutional challenge. <u>United States v. Dunnigan</u>, 507 U.S. 87 (1993).

The Test is:

> ...false testimony under oath on affirmation concerning a material



>matter with the willful intent to
>provide false testimony, rather
>than as a result of confusion,
>mistake, or faulty memory.

Dunnigan,supra at 94 (other citations in the opinion omitted).

In Dunnigan,supra at 95, the finding of false testimony was supported because "numerous witnesses who contradicted Respondent regarding so many facts..."

The cases in the Eleventh Circuit usually indicate clear contradiction of the Defendant's testimony, or later admissions that is was false. U.S. v. Arguedas, 86 F.3d 1054 (11th Cir. 1996); U.S. v. Diaz, 190 F.3d 1247 (11th Cir. 1999) (evidence presented categorical opposite of defendant's testimony); U.S. v. Gregg, 179 F.3d 131 (11th Cir. 1999) (testimony contradicted by bank manager).

The Supreme Court in making its determination that this enhancement is constitutional stated, "when contested the elements of perjury must be found by the district court with the specificity we have stated, so the enhancement is far from automatic." Dunnigan,supra at 98.

Mr. Samhan vigorously contests the enhancement, demands strict proof and specificity. Mr. Samhan asserts that no witness has contradicted his testimony that he had no knowledge that the cold medicine would be used to make methamphetamine and maintains that any finding he committed perjury would be primarily because he testified, thus unconstitutional. Dunnigan,supra at 94-95.

I.  THE ALLEGATIONS OF THE GOVERNMENT

The Government submits to U.S. Probation that:

1) "the Defendant asserted he had <u>no knowledge of the destination</u> of the psuedoephredine and he was merely moving boxes without financial compensation at the direction of Haddad."

However, Mr. Samhan did not testify that he had no knowledge of the destination of the psuedoephredine.  Therefore the core factual allegation on p. 13, paragraph 52 is not sustainable.

2) The Government next submits that "he believed the boxes were being shipped <u>to the Middle East from California</u> for consumer consumption."

However, Mr. Samhan did not testify that the boxes were being shipped from the Middle East.  He testified that he assisted the shipments from South Florida to the West Coast of the United States.

Therefore the core factual allegation on p. 13, par. 52 is not sustainable.

3) The Government finally submits that Mr. Samhan lied because "he denied the counter-surveillance driving at Narog's warehouse."

However, the Government conceded that Mr. Samhan was never at Narog's warehouse.  Additionally, the government witness testified with lack of memory, even when refreshed by photos.  He had no idea of the path Mr. Samhan took, observed his driving for a matter of

seconds, did not know the neighborhood and was soundly impeached on cross-examination numerous times.

Mr. Samhan's explanation was clear. He carefully explained the path he took, the fact that it was his first time in the neighborhood, his visit to the lot that had forklifts, the confusion due to the one way streets, the median, the position of Dunkin' Donuts and the series of one way streets when he turned right on 28th Street. Mr. Samhan was not impeached or even questioned in detail about his driving.

Additionally, it would not make sense to attempt to avoid detection since neither Mr. Samhan's vehicle nor the U-haul driven by Mr. Haddad was even in the area of Samhan. Samhan met Mr. Haddad on I-95 and followed him over twenty miles without driving in a counter-surveillance manner.

Wherefore, there is no clear, contradictory proof that Mr. Samhan committed perjury when he testified about his driving that day. Thus, the allegation on p. 13, par. 52 is not sustainable.

II.   LACK OF WITNESS CONTRADICTION OF DEFENDANT TESTIMONY

The Government called no witnesses in rebuttal to contradict what Mr. Samhan stated. None of the witnesses called in trial contradicted the factual allegations in Mr. Samhan's testimony.

Therefore, the theory that Mr. Samhan committed perjury is more subjective, not having the support of any witness such as in Dunnigan, supra, Diaz, supra or Gregg, supra.

III. LACK OF IMPEACHMENT

Mr. Samhan was cross-examined by Mr. O'Malley, a very able and experienced prosecutor. Mr. O'Malley conceded on his rebuttal argument in closing that he did not impeach Mr. Samhan, "because he is not Perry Mason."

However, Mr. O'Malley impeached another defendant regarding his knowledge of English in what might be described as a Perry Mason moment, and totally destroyed the credibility of a witness for Mr. Haddad regarding whether he sold phone cards to the extent claimed.

Therefore the combined lack of impeachment and the inability to call any rebuttal witnesses in no way supports the allegations of false statements on p. 13, par. 52.

IV. OTHER PROOF

Mr. Kalb, a government official, and Mr. Ghantous testified that Mr. Samhan was a good samaritan well beyond the norm. This Court provided an instruction regarding Mr. Samhan's custom and habit because the factual predicate was there. The nature of Mr. Samhan supports his testimony that he was assisting a friend, as opposed to knowingly assisting a drug venture.

This is the counter point of what is required for an enhancement for false testimony. Rather than having government witnesses clearly and soundly contradict a defendant's specific

statement, Samhan has a government witness and a civilian professional support his defense.

### V. THE PSYCHOLOGICAL REPORT CASTS GRAVE DOUBT ON WHETHER MR. SAMHAN MADE IDENTIFIABLE FALSE STATEMENTS AT TRIAL

Mr. Samhan repeated twelfth grade three times in his own language in the West Bank. Because of his lack of intelligence, the undersigned had grave concerns that counsel failed in exploring whether or not the lack of intelligence coupled with his character trait of assisting others should be addressed.

The undersigned retained PhD psychologist Herbert Klein, to administer a series of tests. The undersigned explained to Mr. Samhan and his family that having a low intelligence may explain why he was fooled by Haddad.

The tests were very revealing. Not only was Mr. Samhan in the lower 30% of persons in his age and gender, he was also secretly tested for malingering. (See: Exhibit A).

This sophisticated test revealed that Mr. Samhan was scrupulously honest and that he tried extremely hard on the test.

With everything to gain by providing answers that would make Mr. Samhan look less intelligent, he again established that his instincts, values and character demonstrate honesty and desire to assist others. This is precisely the two ingredients that would establish his innocence.

It is interesting that the California hispanic female relative of Mr. Haddad, who was on the government witness list, was prepared to testify that Mr. Haddad fooled her regarding the nature and purpose of the cold medicine. The Government version in the Presentence investigation confirms that Haddad fooled his family member.

> El Haddad's sister-in-law stated to the agents that El Haddad had sent several other shipments to her residence. She stated that she was told by El Haddad that the shipments contained Tylenol.

PSI, p. 11, par. 35.

Yet she was not even prosecuted for assisting Mr. Haddad. The argument goes that if Mr. Haddad could and would fool his own relative, why could he not fool Mr. Samhan who has an I.Q. in the lower 30% and has the character trait of assisting others and tests as scrupulously honest?

VI.  THE NATURE OF THE DRUG

The charge itself, and the drug, is not of the nature that dramatically compels a finding of knowledge. This is not the case of someone carrying a brick size of cocaine. Virtually every witness including the DEA chemist had no knowledge that cold medicine could be used to make methamphetamine. Mr. Samhan had

no special knowledge in this regard. The government witness in charge of compliance admitted no public warnings are posted.

It is reasonable that one who is honest, who has a low level of intelligence, who has the character trait of assisting others could be fooled regarding something as complicated as using cold medicine to make another drug 3000 miles from home.

VI. THE JURY VERDICT SUPPORTS MR. SAMHAN'S
    TESTIMONY

Mr. Samhan testified before a jury. This jury evaluated his testimony and acquitted him of a general conspiracy to use psuedoephredine to use for an illegal purpose and to manufacture methamphetamine.

It is clear that if the jury thought Mr. Samhan was lying on the stand, he would have been convicted for these charges.

The jury struggled with the requirement of knowledge, and what Mr. Samhan "should have known." The court instructed them over objection to the effect that it would be sufficient if a Defendant merely should have known that the psuedoephredine was going to be used to make an illegal drug.

Finding Mr. Samhan guilty of the precursor charges only, is merely an affirmation in the jury's mind that given all of the circumstances, he should have known. However, this is a very fine line. That is more of a subjective decision on his state of mind and perhaps what they required. This may be a higher standard than is fair given Mr. Samhan's nature, character and intelligence.

The acquittals, however, give strong credence that Mr. Samhan clearly did not lie while testifying.

## CONCLUSION

For the above seven reasons, enhancement would be as much a function of penalizing Mr. Samhan for his Constitutional right to testify as for clear proof that he lied on the stand.

The policy reasons of diluting this Constitutional right and deterring future defendants from testifying in this court for fear of being further penalized on conviction should be considered.

Therefore, the objection to p. 13, par. 52 and on p. 14, par. 59 to an obstruction of justice enhancement must be sustained.

## II. ROLE ADJUSTMENT

The Defendant objects to the failure to provide him with a role adjustment as a minor or in between minimum and minor player. See: page 12, par. 50 and page 14, paragraph 58.

The Defendant moved, packed and shipped boxes at the bequest of Haddad. He was not privy to the warehouse and was not privy to Narog.

There is no evidence that he made any decisions. He did merely grunt work, exposed himself to the public, did not disguise himself, his house or car and made no money.

Pursuant to U.S.S.G. 3B1.2 (b), Mr. Samhan deserves a role reduction of two to three points.

### III. FACTORS THAT WARRANT A DOWNWARD DEPARTURE

The Presentence Investigation report indicates on page 23, section F, that there are no factors that warrant a departure.

The Defendant disagrees and submits that all of the following are "outside of the heartland" pursuant to <u>Koon v. United States</u>, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed. 2d 392 (1996).

    A. DEPORTATION, SEPARATION FROM FAMILY AND

       POTENTIAL DEATH BY TERRORISM

Mr. Ghantous, Mr. Kalb and Mr. Samhan testified that the Defendant was granted political asylum because he proposed peace with Israel. Mr. Kalb has written in the bond proceedings that Mr. Samhan had one of the most sincere and well founded fear of prosecution he had encountered.

The wife and children of Mr. Samhan are United States Citizens. Mr. Samhan is not. He is deportable because of this conviction. Deportation in his particular circumstances would have such harsh consequences that it is outside of the heartland and a reduced sentence is the only way of balancing these additional penalties as a result of conviction.

Therefore, a substantial downward departure is warranted.

    B. THE DELAY

Mr. Samhan objected each time to the delay of the proceedings. The Magistrate and this Court found presumptive prejudice, but no actual prejudice. This Court has stated an awareness of the

10

anxiety and concern defendants have when they live with the fear of the outcome of trial over an extended period of time.

The delay, with no remedy of dismissal, should at least warrant some departure for this anxiety and concern.

### C. THE DISADVANTAGE OF BEING TRIED AS AN ARAB, POST SEPTEMBER 11, 2001

Due to the delay, Mr. Samhan found himself in a trial in a conservative county, influenced by a large Jewish population, as an Arab and tried with other Arabs.

One of the attorneys for a codefendant aggravated the circumstances by demeaning Arabs due to their facial features, customs and business practices.

Being tried within six months of the worst terrorist attack on U.S. soil as an Arab is well "outside of the heartland." Knowing that this severe disadvantage occurred because of delay not caused by Samhan is clearly a reason for a downward departure.

### D. INCONSISTENT VERDICTS

The Defendant was acquitted of the general conspiracy and the count involving methamphetamine. This Court ruled in denying Defendant Samhan's judgment of acquittal, that if he assisted in the packing and shipment of boxes of psuedoephredine that he could be found guilty of conspiring to manufacture methamphetamine.

It seems clear enough that the acquittal the main two counts so overlaps the convictions of the others, that this inconsistency is "outside of the heartland" and deserving of a substantial downward departure.

11

E.  INCONSISTENT INDICTMENT AND INSTRUCTION

The Defendant vigorously and strategically defended an indictment making it a crime to know, or should know, that he was assisting a <u>methamphetamine</u> conspiracy.

Well after presentation of the evidence and after argument, the deck of the indictment was shuffled and the government was now being held to the lesser standard of knowledge of any drug.

Such lack of notice and changing of circumstances is so outside of the heartland and so likely a reason for conviction that a substantial downward departure is warranted.

F. CHARACTER OF DEFENDANT

Mr. Samhan, by all accounts, is one the few extraordinary persons who gives substantially far more than he takes. It is doubtful that this Court will ever judge a defendant who is so compelled to give of his time and serve anyone in need, regardless of religion or culture.

All of the evidence, including testimony and analysis of the lead agent, who has an accounting background, demonstrates that Mr. Samhan made no money for assisting Mr. Haddad.

Given Mr. Samhan's vulnerability of assisting others, which is not a defense, but may be viewed as an imperfect defense for sentencing, the level 30 guideline, even without the enhancement for obstruction of justice appears harsh.

Mr. Samhan's extraordinary character related to the facts of his involvement are so "outside of the heartland", that a substantial departure is warranted.

## CONCLUSION

If the Court does not agree that each ground or that any single factor entitles Mr. Samhan to a substantial downward departure, the combination of all of these factors under 5K2.0 is more than sufficient for a substantial downward departure. United States v. Cook, 938 F. 2d 149,153 (9th Cir. 1991). Koon, supra.

Based on all of the theories of departure, a sentence of less than three years is urged and warranted.

Respectfully Submitted by,

Richard A. Hamar
Florida Bar # 127562
2437 Briarcrest Road
Beverly Hills, CA 90210
(310) 550-0460
(310) 550-0461
Attorney for Samhan

## PROOF OF SERVICE

I, Richard A. Hamar, declare: I am a citizen of the United States; I am over the age of eighteen years and not a party to this action; my business address is 2437 Briarcrest Road, Beverly Hills, CA 90210.

On May 8, 2002, I mailed these OBJECTIONS TO PRESENTENCE INVESTIGATION to William Zlock (who will represent the Government at sentencing on June 7, 2002), Assistant United States Attorney, located at 701 Clematis Street, West Palm Beach, Florida 33401 and Patricia Borah, Sr. United States Probation Officer, 501 South Flagler Drive, room 400, West Palm Beach, Florida 33401-5912. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This was executed at Beverly Hills, CA.

_____
RICHARD A. HAMAR



**HARVEY A. KLEIN, Ph.D.**
Licensed Psychologist

Diplomate in Clinical Psychology
American Board of Professional Psychology
Diplomate - Fellow in Psychopharmacology

12788 West Forest Hill Blvd.
Suite 1002
Wellington, FL 33414
Telephone: (561) 793-4400

**NAME**: Mohammad Senham   **AGE**: 37   **SEX**: Male   **DOB**: 1/16/65   **DATE**: 05/04/02
**EXAMINER**: Harvey A. Klein, Ph.D., ABPP   **REFERRED**: Richard Hamar, Esq.

**Tests Administered**
TOMM (Test of Memory Malingering)
Wechsler Adult Intelligence Scale - III (WAIS-III)

**Reason for Referral**
Mohammad was referred for an evaluation by R. Hamar, Esq, his Attorney, because of legal issues.

**Background**
Mohammad is a 37 year-old male. He is married. Mohammad has no major medical problems that were reported. He moved from Palestine to the U.S. many years ago and is originally from Jordan. He reported difficulty completing high school in his native country and repeated grade 12 twice until he passed his exams on the 3rd try. I did not discuss his charges with him in any detail. Testing was performed in the Palm Beach County Jail where he is incarcerated pending sentencing.

**Test Session Behavior Test Results**
Mohammad was cooperative throughout the session. He answered all questions. Anxiety or distractibility did not appear to be factors. He appeared adequately motivated.

The TOMM is a test to help determine malingering and the tendency to intentionally fake or exaggerate symptoms or perform poorly for personal gain. Mohammad's performance on this test was excellent and indicated that he was motivated and trying to do well. The test has good face validity as a test of memory and learning as it is not transparent as a test of malingering. Mohammad was clearly motivated throughout the testing session and there was no indication of malingering.

Mohammad was administered 11 subtests of the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) from which his IQ and Index scores were derived. The Full Scale IQ is the aggregate of the Verbal and Performance scores and is usually considered to be the most representative measure of g, or global intellectual functioning. Mohammad's general cognitive ability is in the Average range of intellectual functioning, as measured by the Wechsler Adult Intelligence Scale -Third Edition (WAIS-III). His overall thinking and reasoning abilities exceed those of approximately 39% of adults his age (FSIQ = 96; 95% Confidence Interval = 92-100).

The Verbal score is a measure of acquired knowledge, verbal reasoning, and comprehension of verbal information. His verbal reasoning abilities, as measured by the Verbal IQ, are in the Average range and above those of approximately 45% of his peers (VIQ = 98, 95% Confidence Interval = 93-103). On the verbal reasoning subtests, Mohammad obtained his lowest score on the Vocabulary subtest. His performance differs significantly from his Verbal subtest mean score and suggests that this is the area of most pronounced weakness in Mohammad's profile of verbal reasoning abilities. His weak

Exhibit A



Samhan, Muhammad                Page 2                  05/04/02

performance on the Vocabulary subtest is below that of his peers. The Verbal Comprehension Index (VCI) is similar to the Verbal IQ in that it provides a measure of verbal acquired knowledge and verbal reasoning. However, it does not include the measures of abilities related to working memory, such as holding information to perform a specific task. Therefore, the Verbal Comprehension Index may be considered a purer measure of verbal comprehension than is the Verbal IQ. In Mohammad's case, his Verbal Comprehension Index score is generally comparable to his Verbal IQ score. On tasks measuring verbal knowledge, Mohammad's performance is comparable to that of his peers. His ability to understand and respond to verbally presented material is better than that of 34% of others his age (VCI = 94, 95% Confidence Interval = 89-100).

The Performance score provides an indication of an individual's nonverbal reasoning, spatial processing skills, attentiveness to detail and visual-motor integration. His nonverbal reasoning abilities, as measured by the Performance IQ, are in the Average range and better than those of approximately 30% of his peers (PIQ = 92, 95% Confidence Interval = 86-99). On the nonverbal reasoning subtests, Mohammad's scores are all in the Average range. Across these subtests his performance varies little, with no statistically significant subtest strengths or weaknesses relative to his Performance subtest mean score. The Perceptual Organization Index (POI) is actually a purer measure of nonverbal reasoning than is the Performance IQ. The POI measures fluid reasoning, spatial processing, attentiveness to detail, and visual-motor integration. However, it does not measure the individual's speed in processing information or performing simple tasks related to that information. In Mohammad's case, his Perceptual Organization Index score is comparable to his Performance IQ score. Mohammad's nonverbal reasoning abilities are comparable to those of his peers. His performance on the Perceptual Organization Index exceeds that of 37% of his age-mates (POI = 95, 95% Confidence Interval = 89-103).

WAIS-III Results were as follows:

| WAIS-III SUBTEST SCORES: | | | WAIS-III GLOBAL SCALES | | |
|---|---|---|---|---|---|
| Subtest | S.S. | S/W | Scale | S.S. | %ile |
| VERBAL SCALE | | | VERBAL SCALE IQ: | 96 | 45 |
| Vocabulary: | 6 | W | PERFORMANCE SCALE IQ: | 92 | 30 |
| Similarities: | 11 | | FULL SCALE IQ: | 96 | 39 |
| Arithmetic: | 11 | | | | |
| Digit Span: | 9 | | WAIS-III INDEX SCORES | | |
| Information: | 10 | | Verbal Comprehension | 94 | 34 |
| Comprehension: | 12 | | Perceptual Organization | 95 | 37 |
| PERFORMANCE SCALE | | | | | |
| Picture Completion: | 9 | | | | |
| Digit Symbol: | 8 | | | | |
| Block Design: | 9 | | | | |
| Matrix Reasoning: | 10 | | | | |
| Picture Arrangement: | 9 | | | | |

WAIS-III IQ scores are obtained from the sum of the scale scores written just to the right of the subtests. Subtest scores are based on age and range from 1-19, have a mean of 10 and a standard deviation of 3.

He performed slightly better on verbal reasoning tasks than on nonverbal reasoning tasks, but there is no significant difference between Mohammad's abilities to reason with words and to reason without the use of words. Both Mohammad's verbal reasoning and nonverbal reasoning abilities are also in the Average range. On the basis of his WAIS-III performance, Mohammad's

Samhan, Muhammad           Page 3           05/04/02

the *Average* range. On the basis of his WAIS-III performance, Mohammad's nonverbal reasoning abilities and his verbal comprehension skills are comparable. Mohammad's abilities across all domains are comparable to those of his peers.

**Results Summary**

Mohammad was cooperative, motivated and worked hard to do as well as possible during the evaluation. His overall cognitive ability, as estimated by the Full Scale WAIS-III IQ, is in the *Average* range (FSIQ=96) at a bit below the mean. English as second language may have impaired him with respect to his performance somewhat on the vocabulary subtest which as a significant weakness on the WAIS-III. His vocabulary is very weak and his ability to read detailed documents or understand the nuances of what is asked of him in English may be hampered somewhat despite about average cognitive ability and he dropped out of college classes. He may have been hampered in his own language in this regard as he had difficulty in his native high school also.

Harvey A. Klein, Ph.D., ABPP
Licensed Psychologist: PY0005168