# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

November 09, 2004

Clarence Maddox
Clerk, U.S. District Court
301 N. Miami Avenue
Miami FL 33128

**Appeal Number: 02-13437-AA**
Case Style: USA v. Thomas Narog
District Court Number: 00-06211 CR-DTKH



FILED by _____ D.C.
APPEAL
NOV 1 2 2004
CLARENCE MADDOX
CLER. U.S. DIST. CT.
S.D. OF FLA. - MIAMI

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
   Original Exhibits, consisting of: two boxes
   Original record on appeal or review, consisting of: thirty-seven volumes

*5 vols pkts.*
*10 vols trans.*

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's decision,</u> is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (03-2004)

# United States Court of Appeals
For the Eleventh Circuit

No. 02-13437

District Court Docket No.
00-06211-CR-DTKH

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jun 10, 2004

THOMAS K. KAHN
CLERK
```

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

versus

THOMAS NAROG,
MOHAMMED SAMHAN,
NIZAR FNEICHE,
RAED NASER ALDIN,

    Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Florida

---

JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.



ISSUED AS MANDATE
NOV 0 9 2004
U.S. COURT OF APPEALS
ATLANTA, GA.

    Entered:    June 10, 2004
For the Court:    Thomas K. Kahn, Clerk
    By:    Gilman, Nancy

U.S. v. NAROG    2504

UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas NAROG, Mohammed Samhan,
Nizar Fneiche, Raed Naser Aldin,
Defendants–Appellants.

No. 02-13437.

United States Court of Appeals,
Eleventh Circuit.

June 10, 2004.

**Background:** Defendants were convicted, in the United States District Court for the Southern District of Florida, No. 00-06211-CR-DTKH, Daniel T.K. Hurley, J., of possession of pseudoephedrine with intent to manufacture controlled substance. They appealed.

**Holding:** The Court of Appeals, Fay, Circuit Judge, held that jury instruction constructively amended indictment.

Reversed and remanded.

1. **Criminal Law** ⇌1167(4)
   **Indictment and Information** ⇌159(1)

   Although variance between proof at trial and facts alleged in indictment requires reversal of conviction only when defendant can establish that his rights were substantially prejudiced thereby, constructive amendment of indictment, where essential elements of offense contained in the indictment are altered by jury instructions so as to broaden possible bases for conviction beyond what is contained in indictment, is per se reversible error.

\* Honorable Thomas J. Meskill, United States Circuit Judge for the Second Circuit, sitting by

2. **Indictment and Information** ⇌159(2)

   Trial court constructively amended indictment charging defendants with possession of pseudoephedrine with knowledge that it would be used to manufacture methamphetamine when it advised querying jury that statute authorized conviction if defendants knew or reasonably believed that pseudoephedrine would be used to produce any controlled substance; specification of statute's "controlled substance" as being methamphetamine, in both indictment and proof at trial, precluded conviction for broader statutory crime. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(d)(2), 21 U.S.C.A. § 841(d)(2).

3. **Indictment and Information** ⇌119

   Surplusage in indictment may be deleted without error.

---

Appeals from the United States District Court for the Southern District of Florida.

Before WILSON, FAY and MESKILL\*, Circuit Judges.

FAY, Circuit Judge:

Appellants Thomas Narog, Mohammed Samhan, Nizar Fneiche and Raed Naser Aldin were convicted by a jury for a variety of offenses involving the possession and distribution of pseudoephedrine, a List One chemical. Among their challenges to their respective convictions, all appellants contend that the trial judge erred when, in response to a query from the jury, the district court re-

designation.

Synopsis, Headnotes and Key Number Classification
COPYRIGHT © 2004 by West, a Thomson business

The Synopsis, Headnotes and Key Number Classification constitute no part of the opinion of the court.

2505                    U.S. v. NAROG

sponded that the government need only prove that defendants knew or reasonably believed that the pseudoephedrine would be used to produce *any* controlled substance. Appellants urge that, because the indictment charged specifically that each participated in the scheme knowing or having reasonable cause to believe that the chemical would be used to manufacture methamphetamine, the district court's response to the jury's question constructively amended the indictment. We agree and reverse appellants' convictions.

I.

In May 1999, Thomas Narog filed an application with the DEA for a license to operate as a wholesale distributor of List One chemicals, including pseudoephedrine. After acquiring his license in July of that year, Narog began doing business as Seaside Pharmaceuticals Corporation and operated out of Shurgard Storage Facility units in Fort Lauderdale, Florida. Beginning in September 1999, Narog received several large shipments containing millions of pseudoephedrine pills, prompting a DEA investigation in March of the following year.

DEA learned that Narog employed the services of defendants Raed Naser Aldin and Mohammed Samhan in loading and unloading pallets of pseudoephedrine from one storage unit to another. Keeping close tabs on Samhan and Aldin, DEA discovered that a townhouse in Boynton Beach, Florida was involved in the processing of the pills. In June 2000, DEA observed Aldin discarding over 50 trash bags in dumpsters throughout the area surrounding the Boynton townhome. These bags contained empty pseudoephedrine bottles that were traced to a May shipment to Seaside. Surveillance of the townhouse followed, and on June 4, 2000, agents observed an individual picking up boxes containing 130 pounds of loose pills, which were later received at an "extraction lab" in California. Aldin was again spotted dumping trash bags containing thousands of empty pill bottles in nearby dumpsters, this time accompanied by co-defendant Nizar Fneiche.

DEA eventually suspected that appellants were becoming wise to its surveillance, as Aldin and Samhan were observed on various occasions driving slowly around the storage facility and the townhouse, apparently conducting countersurveillance. During one such outing, when DEA felt that its own surveillance was seriously compromised, agents pulled over Aldin's car and another following behind, in which Fneiche was a passenger. After being advised of their rights, both agreed to speak. Fneiche gave inconsistent statements as to whether he had been at the townhouse, and Aldin denied it though two bottles of pseudoephedrine were found in his car. Shortly after this traffic stop, the agents acquired a warrant to search the townhouse.

In the townhouse, agents immediately noted that, though large, it was sparsely furnished and apparently not used as a residence. Scattered around several rooms were numerous boxes of pseudoephedrine, thousands of empty bottles, plastic baggies, cutting utensils and tape. After the search, Fneiche admitted that he had been in the apartment cutting open bottles of pills. DEA seized the evidence, but activity continued at the Shurgard storage units. On June 14, Narog was observed repositioning pallets of pseudoephedrine between two units, and on June 15, a commercial cargo truck picked up several pallets and delivered them to a nearby Pakmail facility. Samhan and co-defendant Rabah El Haddad were at the Pakmail facility when the truck arrived, and both proceeded to explain to the owner that the pseudoephedrine boxes they were ship-

2506

U.S. v. NAROG

ping to Oregon contained shoes. DEA agents ultimately seized this and other shipments in Oregon, along with similar shipments to clandestine methamphetamine labs in California.

In the meantime, Narog applied to DEA for an exporter's license—supposedly to ship pseudoephedrine to JAM and Drug Store, Inc., two pharmaceutical companies in Israel. During the application process, to DEA's surprise, Narog claimed that he had already exported to Israel all of the pseudoephedrine he had received. He later stated to a DEA investigator that, since applying for his exporter's license, he had only shipped pills to Impact, a pharmaceutical company in Massachusetts. When questioned about the seizure at the Boynton townhouse, Narog suggested that it might have been stolen from his shipment to Impact. Further investigation by DEA, however, revealed that Narog never had any dealings with Impact, and the Israeli pharmaceutical companies did not exist.

Samhan was arrested on July 29, and DEA found in his South Florida home thousands of loose pseudoephedrine pills in ziploc bags and boxes bearing Seaside labels. Search warrants were executed at Narog's residence and Shurgard on the same day. Blank Impact purchase orders were found along with financial records corroborating Seaside's purchase of pseudoephedrine in bulk, but no record of legitimate distribution or exportation of the pills was found. Soon after, appellants were indicted for their involvement in the pseudoephedrine distribution scheme.

The original charging document was superseded on February 27, 2001 by a fourteen-count superseding indictment charging appellants Narog, Aldin, Samhan, Fneiche and other named co-defendants with offenses involving the possession and distribution of pseudoephedrine. Specifically, Count 1 charged appellants with conspiracy to possess and distribute pseudoephedrine "knowing and having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance, that is, methamphetamine," in violation of 21 U.S.C. § 846. Count 2 charged appellants Narog and Samhan, and co-defendant El Haddad, with conspiracy to manufacture at least 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Counts 3, 6, 8, 10 and 13 charged Narog individually with knowingly and intentionally possessing and distributing pseudoephedrine, again having reasonable cause to believe that it would be used to manufacture a controlled substance, "that is, methamphetamine," in violation of 21 U.S.C. § 841(d)(2) and 18 U.S.C. § 2. Likewise, Counts 4, 5, 7 and 9 charged Narog with possessing pseudoephedrine on various dates with intent to manufacture a controlled substance, "that is, methamphetamine," in violation of 21 U.S.C. 841 § (d)(1) and 18 U.S.C. § 2. Count 11 charged all appellants with the substantive crime of possessing and distributing pseudoephedrine on or about June 1, 2000, knowing or having reasonable cause to believe that it would be used to manufacture a controlled substance, "that is, methamphetamine," in violation of 21 U.S.C. § 841(d)(2) and 18 U.S.C. § 2. Finally, counts 12 and 14 charged the same crime as in Count 11, but on the dates of June 15 and July 21, 2000, and only against appellants Narog and Samhan, and co-defendant El Haddad.

Appellants, along with co-defendants Nabil Aquil and El Haddad, proceeded to trial on February 4, 2002. Throughout the six week trial, the government introduced evidence and testimony in an attempt to show that the defendants knew, or had reasonable cause to believe, that the pseudoephedrine would be

2507                    U.S. v. NAROG

used to make methamphetamine. An abundance of evidence set forth that pseudoephedrine was, indeed, used in the manufacture of methamphetamine. Government experts corroborated this evidence. In fact, no evidence in the record even suggested that another controlled substance could be made using pseudoephedrine. The district court's charge to the jury tracked the indictment to the extent that it required the jury to find that defendants knew or had reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance, and added (both orally and in the written instructions given to the jury) that "methamphetamine is a controlled substance within the meaning of the law." The jury was clearly confused, however, as the following written question was raised during deliberations:

> Re: *Charge 11*
>
> Reasonable cause to believe standard
>
> vs.
>
> State proving its case
>
> \*Did a defendant have to have knowledge or reasonable cause to believe the pseudoephedrine would be used to make *specifically* methamphetamine to be guilty?

After entertaining extensive argument on the issue, the district court rejected the idea that the government had "effectively heightened and raised the *mens rea* requirement" when it identified the particular controlled substance in the indictment. The court then responded to the jury's query:

> The answer to your question is no. Let me give you this instruction. As to this charge, the government need not prove that a Defendant knew or had reasonable cause to believe the exact nature of the controlled substance to be manufactured. What the government must prove beyond a reasonable doubt is that a Defendant knew or had reasonable cause to believe that the pseudoephedrine would be used to manufacture some controlled substance.

The jury returned to the deliberation room and, soon after, returned the following verdict: Narog was convicted on all counts; Samhan was acquitted on the conspiracies charged in Counts 1 and 2, but convicted of the substantive charges in Counts 11, 12 and 14; Aldin was found guilty on Counts 1 and 11; and Fneiche was acquitted on Count 1 and convicted on Count 11.

## II.

[1] All appellants contend that the district court's response to the jury's question constructively amended the indictment, and urge that such an amendment mandates *per se* reversal of their convictions. The government counters that its use of the phrase "that is, methamphetamine" in the indictment was mere surplusage, and thus no constructive amendment occurred. Alternatively, the government argues that even if the district court's response varied from the indictment, that variance was not material and thus does not require reversal. At the forefront, it is necessary to distinguish the oft-confused concepts of variance and constructive amendment. As this Court succinctly stated in *Keller*:

> [A]n amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment. A variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same.

*United States v. Keller*, 916 F.2d 628, 634 (11th Cir.1990); *see also, United States v.*

U.S. v. NAROG         2508

*Flynt*, 15 F.3d 1002, 1005-06 (11th Cir.1994). Whereas a variance requires reversal only when the defendant can establish that his rights were substantially prejudiced thereby, constructive amendment of the indictment is *per se* reversible error. *Keller*, 916 F.2d at 633; *Flynt*, 15 F.3d at 1005.

[2] We are not faced with a variance issue here. The facts proved at trial did not deviate from the facts alleged in the indictment—the grand jury charged this case as a methamphetamine case, and the government tried it as such. There was simply nothing else involved. The defendants were accused of collecting large amounts of pseudoephedrine and shipping it to a lab where it would be used to manufacture methamphetamine. There were no allegations of other activity and all of the evidence dealt with exactly what was alleged—securing pseudoephedrine for the manufacturing of methamphetamine. The issue is whether the district court's charge to the jury constructively broadened the possible bases for the conviction; thus the issue we face here is one of constructive amendment.[1]

Appellants direct our attention to various authorities from this Court, other circuits and the Supreme Court outlining the basic tenets of constructive amendment, including the seminal case on the issue, *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Most appellants rely heavily on our decision in *Cancelliere*, where we found that redacting the word "willfully" from an indictment charging defendant with "knowingly and willfully" committing the offense of money laundering was a constructive amendment of the indictment. *United States v. Cancelliere*, 69 F.3d 1116, 1121 (11th Cir. 1995). Our Court noted that, though the term "willfully" was included by the government by mistake, the charge was read to the jury at the beginning of the trial, the jury listened to defendant try to prove he acted in good faith, and then the district court "instructed them they could convict without mentioning any requirement that they find he acted willfully." *Id.* This redaction, our Court found, impermissibly broadened the scope of the indictment and mandated reversal. *Id.*

The general reasoning set forth in *Cancelliere*, that a constructive amendment occurs when the indictment is broadened by instruction of the court, is certainly instructive. However, the particular question we are faced with here is whether an indictment—containing *both* the broad language of the statutory crime and additional language seemingly narrowing the charged crime to a subset of the statutory crime—is unconstitutionally amended when that narrowing language is removed. We find this Court's opinion in *United States v. Weissman*, 899 F.2d 1111 (11th Cir.1990) to be more pertinent, and indeed indistinguishable, from the case at bar.

*Weissman* involved three members of a crime syndicate that were convicted by a jury of RICO conspiracy. *Id.* at 1112. Count 2, the charge under which each appellant was convicted, alleged that defendants:

> [K]nowingly and willfully ... conspired ... with each other ... to commit offenses against the United States, that is, while employed by or associated with an enterprise, to wit, a group of individuals associ-

---

1. We recognize that the jury's question was specifically directed to Count 11. However, as stated earlier, this entire case dealt with one scenario of receiving large quantities of pseudoephedrine for use in the manufacturing of methamphetamine. Therefore, the trial court's response amounted to a constructive amendment of each and every count in the indictment.

**2509**  U.S. v. NAROG

ated in fact known as the DeCavalcante Family of La Cosa Nostra....

*Id.* Throughout the trial, the government introduced evidence to link defendants with the DeCavalcante Family, and in its closing argument reiterated that the enterprise in which defendants were involved was that family. *Id.* at 1112–13. The trial court's initial charge to the jury recognized that "enterprise" was defined in the indictment as the DeCavalcante Family. *Id.* at 1113. Shortly after retiring to deliberate, however, the jury submitted a query to the trial judge asking, with respect to the RICO count, whether "enterprise" and DeCavalcante Family were synonymous. After entertaining argument, the district court responded that it was *not* necessary for the government to prove that the enterprise was the DeCavalcante Family "if there was an enterprise proved that meets the definition of the term." *Id.* The jury rendered its verdict on the following day, convicting appellants on all counts save one RICO conspiracy count.

On appeal, our Court reversed appellants' convictions, finding that the district court's supplemental instructions constructively amended the indictment. *Id.* at 1115. The panel noted that the government could have used the general language of the statute to refer to the enterprise, but instead chose to specify that the appellants were associated with an enterprise, "to wit, a group of individuals associated in fact known as the DeCavalcante Family." *Id.* Our Court found that the trial court should have informed the jury, "in conformity with the charges brought in this indictment," that enterprise was synonymous with the DeCavalcante Family. The district court's supplemental instruction, although "adequately stating the general law, ... 'altered an essential element of the crime charged.'" *Id.*

We find that the *Weissman* decision completely encompasses, and resolves, the constructive amendment challenge raised here. As in *Weissman*, the indictment charged that defendants committed the crimes either knowing or having reasonable cause to believe that the List One substance pseudoephedrine would be used to manufacture a controlled substance, "that is, methamphetamine." By including this last phrase in the indictment, the government essentially charged a subset of the statutory crime. The jury, in response to its query, should have been informed that "controlled substances," in this case, was synonymous with methamphetamine. By instructing the jury that it only needed to find that defendants knew or had reasonable cause to believe that the pseudoephedrine would be used to make any controlled substance, the district court unconstitutionally broadened the crimes charged in the indictment. The jury may well have convicted appellants of believing that the pills would be used to manufacture a controlled substance other than the one specified therein, although there was no evidence of such.

[3] We reject the government's contention that utilization of the phrase, "that is, methamphetamine," was mere surplusage. It is accurate that surplusage in an indictment may be deleted without error. *United States v. Miller*, 471 U.S. 130, 140, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); *Cancelliere*, 69 F.3d at 1121 (citing *Miller*). The government relies heavily on this Court's decision in *Williams* to support the application of the "surplusage" doctrine. *United States v. Williams*, 334 F.3d 1228 (11th Cir.2003). However, the government again confuses the concepts of constructive amendment and variance. *Williams* is plainly the latter. In that case, defendant Williams was charged with aiding and abetting the using and carry-

U.S. v. NAROG 2510

ing of a firearm, "that is, a handgun." *Id.* at 1231. During the trial, the government presented evidence that co-defendant Addison carried an AK–47 assault rifle, while Williams himself carried the handgun. *Id.* at 1230. Thus, the evidence showed Williams aided and abetted the use of the assault rifle—not the use of the handgun as the indictment charged. Defendant apparently never maintained that a constructive amendment analysis was appropriate because he never "argue[d] a *per se* reversible error." *Id.* at 1232. Therefore, the Court only considered whether there was a variance between the indictment and the proof at trial. Ultimately, this Court found the phrase, "that is, a handgun," to be mere surplusage because defendant Williams did not allege, nor could he show, that the variance somehow prejudiced him. *Id.* Appellants in this matter, on the other hand, are not required to demonstrate that they were prejudiced. The matter is one solely of constructive amendment, and we find we are bound by the clear precedent set forth in *Weissman*. Accordingly, we reverse appellants' convictions.

### III.

Appellants' convictions are REVERSED and the matter remanded for appropriate proceedings.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia